IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-8575

_____

ROBERT MADDEN

Petitioner-Appellant,

versus

JAMES A. COLLINS, DIRECTOR,
Texas Department of Criminal Justice,
Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

(March 29, 1994)


BEFORE JONES, DUHÉ, and WIENER, Circuit Judges.

Wiener, Circuit Judge:

In this petition for writ of habeas corpus, Petitioner-Appellant Robert Madden challenges the constitutionality of the Texas special issues as applied to him, as well as comments made by the state in closing arguments. We conclude that Madden's evidence does not fall within the ambit of <u>Penry</u> and thus he was not entitled to additional jury instructions. Similarly, we find no merit in Madden's contentions that various comments by the prosecutor deprived him of a fair trial. Accordingly, we affirm the denial of his habeas petition.

I

FACTS AND PROCEEDINGS

Madden was charged with the capital murder of Herbert Megason, whose body, found some four to five days after his death, was hidden in a creek on his weekend place in the country. Megason had been shot with a .22 caliber pistol. Also found in the creek was the body of Megason's son, Gary, who apparently had been shot in the back with a shotgun and whose throat had been slashed. Gary also had defense wounds from a knife on his hands and forearm. Each man's feet were bound, as were Gary's hands.

Madden was apprehended when he signed his own name to Megason's Texaco credit card. In addition, he admitted to Donald Jeffries, a new acquaintance, that he had stolen the Megasons' truck. He also had in his possession various items belonging to Megason. Most damaging, however, was his possession of the murder weaponsSQthe .22 pistol, the .22 Winchester rifle, and a bloodstained knifeSQwhich he attempted to sell to Jeffries.

Based on this evidence, Madden was convicted of the murder of Herbert Megason. The judge then submitted to the jury the first two special issues:

> (1) was the conduct of the defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased would result? and

> (2) is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

The jury answered these questions in the affirmative; accordingly, the judge sentenced Madden to death.

Madden's conviction was appealed automatically to the Texas Court of Criminal Appeals, which affirmed both the verdict and the sentence.[1]  Following this affirmance and denial of certiorari by the U.S. Supreme Court,[2] Madden sought a writ of habeas corpus in state court, which transmitted the case to the Texas Court of Criminal Appeals without findings of fact or conclusions of law. That court denied relief, and Madden pursued his habeas petition in federal court.

The district court likewise denied all habeas relief, although it granted Madden's request for a certificate of probable cause. The court reasoned that, "[a]lthough Mr. Madden presents evidence that is more analogous to Penry than other cases before the Fifth Circuit, there is not substantial evidence that the criminal conduct was attributable to the learning disorder, mental illness, or substance abuse."

## II

## ANALYSIS

A. Standard of Review

"In considering a federal habeas corpus petition presented by a petitioner in state custody, federal courts must accord a presumption of correctness to any state court factual findings. . . . We review the district court's findings of fact for clear

---

[1] Madden v. State, 799 S.W.2d 683 (Tex. Crim. App. 1990).

[2] Madden v. Texas, 111 S.Ct. 1096, 1433 (1991).

3

error, but decide any issues of law de novo."[3]  Evaluation of a petitioner's constitutional challenge to the Texas special issues as applied to him is, of course, an issue of law.

B. Penry Claim

Madden first challenges the constitutionality of the special issues as applied to him, insisting that these questions failed to give effect to his mitigating evidence of mental illness, dyslexia, and substance abuse.  In support of his argument, he relies on the Supreme Court's decision in Penry v. Lynaugh,[4] in which the Court held that the special issues did not give effect to the petitioner's evidence of mental retardation and abused childhood to the extent these facts mitigated his culpability for the crime.  We review Madden's claim under Penry and the subsequent cases that have clarified its holding.[5]

In Penry, the Court reiterated that the Eight Amendment requires an "individualized sentencing determination" by the sentencer;[6] one that ensures that "the sentence imposed at the penalty stage . . . reflect[s] a reasoned moral response to the defendant;s background, character, and crime."[7]  Thus, the

_____

[3] Barnard v. Collins, 958 F.2d 634, 636 (5th Cir. 1992)(citations omitted); see 28 U.S.C. § 2254(d).

[4] 492 U.S. 302 (1989).

[5] See, e.g., Johnson v. Texas, 113 S.Ct. 2568 (1993); Graham v. Collins, 506 U.S. ___, 113 S.Ct. ___, 122 L.Ed.2d 260 (1993), Graham v. Collins, 950 F.2d 1009 (5th Cir. 1992)(en banc).

[6] Penry, 492 U.S. at 316.

[7] Id. at 319 (quoting California v. Brown, 479 U.S. 538, 545 (1987)).

4

constitutionality of the Texas scheme, which considers mitigating evidence solely through the special issues, "turns on whether the enumerated questions allow consideration of particularized mitigating factors."[8]

Ultimately, the Court in Penry concluded that the special issues failed to give full effect to Penry's mitigating evidence of mental retardation and abused childhood. Specifically, although Penry's mitigating evidence reduced his culpability for the crime, the jury could not express its reasoned moral response through the special issues as submitted. Penry's mitigating evidence was relevant on the first issueSQdeliberatenessSQbut had only a marginal mitigating effect. In addition, the Court emphasized that Penry's evidence on the second issue was a "double edged sword": it mitigated his responsibility because he was generally less able to control his behavior than an average person; at the same time, because he could never learn from his mistakes, he posed a future danger to the community. Moreover, as we explained subsequent to Penry, this evidence rendered Penry less culpable "because these characteristics were due to uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own."[9]

1. Personality Disorder

At the punishment phase of the trial, clinical psychologist Dr. Jim Whitley, who had examined Madden twice, testified that

---

[8] Jurek v. Texas, 428 U.S. 262, 272 (1976).

[9] Graham, 950 F.2d at 1029.

Madden suffers from a personality avoidance disorder, which Dr. Whitley characterized as a "clinical mental illness" that impairs Madden's ability "to think and react in a logical manner." Madden's particular personality disorder impairs his ability to interact with others and form relationships, causing him to run from conflict. Thus, the testimony established that a person with a personality avoidance disorder was generally not violent. The disorder does not, however, prevent Madden from understanding the wrongfulness of his actions.

According to Dr. Whitley, the disorder also makes Madden more susceptible to substance abuse. In Madden's case, Dr. Whitley concluded that the combined effects of the personality disorder and the long term drug abuse had caused Madden to suffer diminished capacity. Diminished capacity, in psychological terms, refers to a deterioration or distortion of one's ability to make logical and rational decisions.

The first inquiry in a Penry claim is whether the mitigating evidence is relevant. Phrased differently, does the evidence implicate the basic concern of Penry "that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."[10] In Penry, the defendant's mental retardation rendered him "less able than a normal adult to control his impulses or to evaluate the consequences of his

---

[10] Penry, 492 U.S. at 319.

6

conduct."[11] Thus, there was a clear nexus between Penry's handicap and his criminal act; the criminal act was attributable to his severe permanent handicap. The testimony of Dr. Whitley established that Madden has an emotional disorder specifically, an anti-social personality. The relevance of this disorder to Madden's crime, however, is less than clear.

Certainly, the evidence establishes generally that persons with such personality disorders are more likely to use drugs, and that drug users are more likely than non-users to engage in violent behavior. There is no evidence, however, that Madden was intoxicated at the time of the murders. To the contrary, there is evidence that he had finally gained some control over his addiction. Thus, it cannot be said that Madden's tendency towards substance abuse is directly responsible for the instant crime, i.e., that the crime is attributable to such abuse in the Graham sense.

Conspicuously absent from the testimony of Dr. Whitley is any general statement that a person with a personality avoidance disorder is more aggressive or violent than an unafflicted person, or any specific statement that Madden is. To the contrary, Dr. Whitley testified that victims of such a disorder are less aggressiveSQexcept when they are intoxicated. Also noticeably absent in this testimony was evidence that Madden was incapable of controlling his impulses or unable to distinguish right from wrong. Rather, Dr. Whitley specifically stated that a personality disorder

---

[11] Id. at 322.

7

does not impair one's ability to understand the wrongfulness of his actions.

Based on this evidence, we conclude that there is insubstantial evidence that Madden's criminal actions are attributable to his anti-social personality. Thus, the state court did not err by refusing to give additional instructions.

## 2. Learning Disability

Madden's learning disability does not fall within the ambit of Penry. In Graham, we emphasized that Penry's evidence "was strongly mitigating because these characteristics were due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own, mental retardation, organic brain damage, and an abused childhood."[12] By imposing the requirement that a handicap be "uniquely severe," we acknowledged that not all organic brain damage will establish a Penry claim; rather, organic brain damage is an example of the type of evidence that we require as a minimum for a challenge under Penry. Although dyslexia may be defined as an organic brain impairment, it is not so "uniquely severe" that it rises to the level of a Penry claim.

## 3. Troubled Childhood

Madden presented evidence of a troubled childhood, including abuse while an infant. His father left his mother when Madden was two and subsequently remarried. Madden's step-father adopted him when the boy was five years old, and there is no allegation that

---

[12] Graham, 950 F.2d at 1029.

8

the adoptive father abused Madden. There is, in fact, evidence that Madden's adoptive father was a very concerned parent.

In Barnard v. Collins, we recognized that an abused childhood could rise to the level of a Penry claim if the traumatic events caused psychological effects to which the criminal conduct was attributable. Although Dr. Whitley's testimony linked Madden's personality disorder to his childhood, we have concluded above that his personality disorder is not linked causally to the criminal act. As there is no other evidence regarding the effect of this short-lived abuse on Madden, he fails to produce substantial evidence that his childhood abuse (if "abuse" it truly was) had such a psychological effect on him that it led to the criminal act.

We conclude, then, that Madden's reliance on his personality disorder, his learning disability, and his troubled childhood as mitigation in support of his Penry claim, is misplaced. To grant relief on a Penry claim, we must determine (1) that the proffered evidence was constitutionally relevant mitigating evidence, and, if so, (2) that the proffered evidence was beyond the "effective reach" of the jurors.[13] Thus rejection of a Penry claim does not necessarily mean in every case that the jury was able to evaluate the proffered evidence fully and fairly. A Penry claim rejection may also be based on the failure of the evidence relied upon by the petitioner to be constitutionally relevant mitigating evidence. As we find such failure here, we need not and therefore do not

---

[13] See Johnson, 113 S.Ct. at 2268-69 (employing two-part analysis and rejecting Petitioner's Penry claim predicated on youth).

consider the ability of the jury to consider under the Texas special issues the evidence pointed to by Madden.[14]

4. Prosecutor's Statements

Madden also insists that the jury could not consider the mitigating evidence because (1) the court failed to define the word "deliberately" in the first special issue and (2) the prosecutor suggested that the jurors were not to consider the evidence and that they were not there to determine whether Madden lived or died. As we have held that Madden's evidence was irrelevant, these arguments are moot. In any event, we have held consistently that the word deliberately is clear to the average juror and needs no additional definition. Concerns as to any possible ambiguity arise only when the special issues have not given full effect to the mitigating evidence. Moreover, as Madden failed to raise the second argument before the district court, he cannot raise it for

---

[14] Nonetheless, if we assume arguendo (without granting) that some of the evidence pointed out by Madden <u>is</u> constitutionally relevant mitigating evidence, we still reach two alternative conclusions, either of which would suffice as a reason to reject his <u>Penry</u> claims. First, we conclude that in this case the evidence of Madden's personality disorder, learning disability, and troubled childhood were within the "effective reach" of the jury, as such evidence could be considered by the jury to some extent under one of the special issuesSQparticularly the issue of "future dangerousness." Second, we conclude that Madden's claims in that regard are barred by <u>Teague v. Lane</u>, 489 U.S. 288, 109 S.Ct. 1060 (1989), as interpreted by the Supreme Court in <u>Graham v. Collins</u>, 113 S.Ct. 892 (1993). As none of Madden's mitigating evidence was truly doubled-edged in a way that Penry's evidence was, and as Madden's evidence could be considered by the jury under the first or second special issue, the relief Madden seeks was not "dictated" by precedent and thus constitutes a "new rule" under <u>Teague</u>.

the first time on appeal.[15]

C. Madden's Failure to Testify

Madden also challenges the propriety of the prosecutor's statements regarding his failure to testify. The statement at issue, made during the guilt-innocence phase, is as follows:

> Then, also, the defense will argue that why in the world would someone who killed, murdered two people and stole this credit card sign their own name to the Texaco card? I don't know that; you don't know why. There's only one person here that knows why, and there's only one person here that knows the answer to all of these questions.

The Texas Court of Criminal Appeals held that this passage represented an impermissible reference to Madden's failure to testify, but concluded that the reference was harmless beyond a reasonable doubt.[16] The district court, relying on Milton v. Procunier,[17] held that the statement, taken in context, was not a comment on defendant's failure to testify. Alternatively, the district court concluded that, if there was error, it was harmless.

When reviewing a claim that the prosecutor impermissibly commented on the defendant's failure to testify, we ask "whether or not the [prosecutor's] statement was manifestly intended or was of such character that a jury would naturally and necessarily take it

---

[15] Alexander v. McCotter, 775 F.2d 595, 603 (5th Cir. 1985)(citations omitted).

[16] Madden, 799 S.W.2d at 699-700.

[17] 744 F.2d 1091, 1094-95 (5th Cir. 1984), cert. denied, 471 U.S. 1030 (1985)(prosecutor stated there was only one person who could tell the jury about the crime, referring to an eye-witness).

to be a comment on the failure of the accused to testify."[18]  We cannot agree with the district court that the prosecutor's statement was not a comment on Madden's failure to testify.  A review of Milton convinces us that it is not dispositive, as the prosecutor there was clearly referring to the existence of an eye-witness.  In contrast, the prosecutor's statement in the instant case could apply only to Madden, and it undeniably directs the jury's attention to Madden's silence.  Consequently, we agree with the Texas Court of Criminal Appeals that the statement was an impermissible comment on Madden's failure to testify.

We also agree with the state and district courts that such error is harmless under Chapman v. California,[19] as it would be under Brecht v. Abrahamson[20] and Kotteakos v. United States.[21]  The statement was made in connection with Madden's signature of his own name on Megason's Texaco cardSQa mistake which led to his capture.  Admittedly, the card also suggested Madden's guilt as it tended to place him at the scene of the crime and implicate him in the robbery of the victim.  There was, however, other evidence of a similar nature (Madden's possession of Megason's tool box and watch; his admission that he stole Megason's truck) and evidence of a far more damaging nature (possession of all three murder

---

[18] United States v. Wilson, 500 F.2d 715, 721 (5th Cir. 1974), cert. denied, 420 U.S. 977 (1975); see Milton, 744 F.2d at 1095.

[19] 386 U.S. 18, 21-26 (1967).

[20] 113 S.Ct. 1710 (1993).

[21] 328 U.S. 750 (1946).

weapons).

In addition, the prosecutor's statement was made in anticipation of the defense's argument that a guilty man would not sign his own name, thereby leading police to him. The defense did indeed make this argument, asking rhetorically in closing why the defendant would use his own name. Accordingly, we hold that the error was harmless beyond a reasonable doubt and does not require reversal.

D. Jury Instructions

Finally, Madden insists that the court's failure to instruct the jury as to the parole consequences of a life sentence, after the possibility of parole was raised by the prosecutor in closing arguments, biased the jury in favor of a death sentence. Specifically, Madden refers to the prosecutor's statement that:

> [The second special issue] talks of acts of violence, not murder. They can be assaults; they can be anything, but he is a ticking timebomb. And if we don't take him off the streets permanently by answering these questions yes, who will be next in that path? . . . And what we must do here is protect ourselves and our families from people like Robert Madden.

In addition, Madden insists that the court compounded this error by instructing the jury that it was not to consider or discuss the possibility of parole or the length of time required to satisfy a sentence of life imprisonment.

Madden concedes that an instruction on parole is not constitutionally mandated in capital cases.[22] He insists, however,

---

[22] Andrade v. McCotter, 805 F.2d 1190 (5th Cir.), cert. denied, 475 U.S. 1112 (1986).

13

that such an instruction is necessary in the instant case because of the "facts which created a special hazard in relation to the question of parole." We cannot agree, however, that the statements of the prosecutor or the court created a special hazard. The only potential reference to parole is the plea to take Madden "off the streets permanently." We decline to interpret this statement relating to Madden's future dangerousness as a veiled reference to release on parole. Doing so would require a strained manipulation of one euphemistic phrase that never even mentions the word parole or any synonym for it. Neither will we interpret the trial court's instruction <u>not</u> to consider the possibility of parole as an improper reference.

Madden also challenges the failure to give a parole instruction on equal protection grounds. He insists that the failure to give such an instruction in a capital case, compared to the requirement of a parole instruction for non-capital cases, violates the Equal Protection Clause. He admits that normally there is a rational basis for the distinction, but contends that this basis was destroyed by the prosecutor's statements and the court's instructions. As we have rejected Madden's argument that the prosecutor and the trial court impermissibly implicated consideration of parole, his equal protection argument is moot.

## III

## CONCLUSION

Despite a valiant attempt by Madden's counsel to elevate evidence of the defendant's personality disorder, cum dyslexia, cum

14

drug addiction to the level of a <u>Penry</u> violation, we conclude that there is no constitutionally relevant mitigating evidence that Madden's criminal actions are attributable to these problems. Accordingly, there was no need for additional instructions. Having concluded that the evidence was not relevant to Madden's moral culpability, his related arguments that the jury could not consider this evidence must fail. Likewise, Madden's challenge to the prosecutor's impermissible reference to the defendant's failure to testify fails, as we conclude that the error was harmless in light of the other evidence. Finally, we reject Madden's claim that the prosecutor and trial court impermissibly interjected the issue of parole into the sentencing phase. We decline the tortuous interpretation necessary to reach that conclusion.

For the foregoing reasons, the district court's denial of the petition for writ of habeas corpus is

AFFIRMED.

15