IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-10994
_____

DAVID MARTIN LONG,

                              Petitioner-Appellant,

          v.

GARY L JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

                              Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
(3:95-CV-2241)
_____

July 15, 1999

Before KING, Chief Judge, and DAVIS and WIENER, Circuit Judges.

KING, Chief Judge:[*]

     David Martin Long seeks a certificate of probable cause to
appeal the district court's denial of his habeas corpus
application.  Long argues that he has raised a substantial
showing of the denial of a federal right with respect to six
issues, including whether he was denied his right to due process
because he was shackled during his trial.  For the reasons that
follow, we decline to grant Long permission to appeal.

_____

     [*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In February 1987, a jury convicted David Long of capital murder for the murders of Dalpha Jester, Donna Jester, and Laura Owens. The factual circumstances of the murders were particularly gruesome. According to the diary of one of the victims, in September 1986, Donna Jester picked Long up as he was hitchhiking and thereafter allowed him to stay in her home that she shared with her mother, Dalpha Jester, and another woman, Laura Owens, and promised to supply him with wine and cigarettes in exchange for house repairs. After a short period of time of living with the three women, Long began to fear that Donna Jester had buried bodies, possibly of other hitchhikers, in her backyard. On September 27, 1986, Long, after doing several repairs on the women's house, began to fear that Donna Jester and Laura Owens were conspiring against him. Long asked Laura Owens to come outside with him because he wanted to talk to her, and then attacked her with a hatchet. After striking Laura Owens, Long entered a bedroom of the house and killed Donna and Dalpha Jester, returning once more to the yard to kill Laura Owens. All three victims sustained defensive wounds to their hands and arms. After cleaning the hatchet, Long fled in Donna Jester's car and was later arrested and released for driving while intoxicated. Long was eventually arrested on October 24, 1996 in Austin, Texas. Following Long's arrest, he confessed to the police that he had committed the three murders and that he had also committed

2

two unrelated murders in San Bernadino, California and Bay City, Texas.

Long initially pleaded not guilty to the capital murders of Donna Jester, Dalpha Jester, and Laura Owens. However, after the testimony of the state's first witness, Long changed his plea to guilty. Specifically, in the presence of the jury, Long stated: "Against the advice of my two attorneys, I'm pleading guilty as hell." After the trial judge asked him to confirm his plea, Long stated: "Yes. I knowingly and intentionally took the lives of those three women. I would have shot them if I had a gun." His guilty plea notwithstanding, both the state and the defense presented evidence and testimony during the guilt-innocence phase of the trial. Although Long's counsel's trial strategy was to convince the jury that Long was insane at the time of the murders, Long repeatedly asserted that he did not want to raise an insanity defense. Further, during the initial direct and cross examination of Long, he repeatedly confessed to the knowing and intentional killing of the three women. After the jury found Long guilty of capital murder, both the state and the defense called witnesses during the punishment phase of the trial. Long told the jury during the punishment phase:

> I don't have any fancy scenarios, or I don't think to be [as] overly dramatic as [my attorney]. . . .
> As far as the issue of insanity goes, I think that you all have done decided that. If you are going to consider that in punishment, then you should have never found me guilty.
> Now, I'll agree that I have got some mental problems. But I still begin to believe that there [are] whitewashed versions of satanic activity.

3

I don't want to die.  I really don't.  But like I said, there are not other options.

If you believe that they are going to send me down there to that prison and I am just going to be put in a cell, you better forget it.

Eventually there may be some young kid coming in there, 20 years old, first time maybe he's incarcerated, I'll kill him.

If I can feel there is something wrong, if something happens, I go into this little state of mind I go into, he's dead.  You had better believe it.  Because they ain't going to put me in no cell down there.  They don't do that. . . .

I'm not saying all this because I want to die.  I don't want to die, but there are no other options for me.

And I know how to do this.  I can get away with it.  I could have gotten away with all this shit.  They didn't have no case but what I gave them.

That's all I have got to say.

After deliberating, the jury sentenced Long to death.

The Texas Court of Criminal Appeals affirmed Long's conviction and sentence, see Long v. State, 823 S.W.2d 259 (Tex. Crim. App. 1991) (en banc), and the Supreme Court denied Long a writ of certiorari, see Long v. Texas, 505 U.S. 1224 (1992).  After his federal application for habeas relief was dismissed for failure to exhaust state court remedies, Long filed a state habeas petition.  On August 30, 1993, the same Texas trial judge who presided over Long's original trial recommended that Long's state petition for habeas relief be denied, and on March 3, 1994, the Texas Court of Criminal Appeals denied collateral relief on the basis that the record supported the trial court's findings of fact and conclusions of law.

Long then filed his current federal habeas corpus application in February 1996.  The district court granted the state's motion for summary judgment on July 9, 1998, denying Long

4

collateral relief.  On August 11, 1998, the district court denied Long a certificate of probable cause (CPC) to appeal the denial of habeas relief to this court.

## II.  DISCUSSION

Long now seeks a CPC from this court to appeal the district court's denial of habeas relief.[1]  To obtain a CPC, the petitioner must make a "substantial showing of a denial of [a] federal right."  Barefoot v. Estelle, 463 U.S. 880, 893 (1983) (internal quotation marks omitted and alteration in original); see Green v. Johnson, 116 F.3d 1115, 1120 (5th Cir. 1997).  Such a showing requires a demonstration that "the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further."  Barefoot, 463 U.S. at 893 n.4 (internal quotation marks and alterations omitted); see Green, 116 F.3d at 1120.  Under the law existing before the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), we must afford a presumption of correctness to all state court findings of fact (subject to certain exceptions), and we review all conclusions of law, including those of the district court, de novo.  See Creel v. Johnson, 162 F.3d 385, 388 (5th Cir. 1998), cert. denied, 119 S. Ct. 2027 (1999).

---

[1] Long filed his federal habeas application before April 24, 1996; the terms of the Anti-Terrorism and Effective Death Penalty Act of 1996 therefore do not apply.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997).

Long raises six claims which he argues demonstrate a substantial showing of the denial of a federal right. We address each in turn.

## A. Shackling of Long During Trial

Long's first claim is that his trial was fundamentally unfair in violation of his right to due process because he was shackled during his entire trial. Before voir dire, Long's counsel objected to Long's continued shackling. The trial judge overruled Long's objection and told the bailiff to "use whatever you feel in the interest of safety is required for security." Again, before his trial was set to begin, Long objected to the shackling, and the trial judge again overruled the objection based on the seriousness of the charges and security concerns. The trial judge also advised Long on how to block the shackles from the jury's view.

Long raised this issue on direct appeal. The Texas Court of Criminal Appeals determined that the trial judge abused his discretion by requiring Long to appear in restraints because the trial judge failed to make specific findings of fact justifying the use of shackles. See Long, 823 S.W.2d at 283. The court concluded, however, that "this abuse of discretion did not prejudice or harm" Long because Long failed to demonstrate that the jury saw the shackles. Id. The Texas Court of Criminal Appeals also noted that the trial judge took measures to prevent the jury from viewing the shackles, including excusing the jury before and after each time Long testified. See id.

6

The district court assumed for the purposes of its decision that Long could prove at an evidentiary hearing that several jurors observed him wearing shackles during trial. Notwithstanding this assumption, the district court concluded that any error resulting from the trial court's decision to shackle Long was harmless. We agree. Despite Long's assertions to the contrary, it is clear from this circuit's case law that the harmless error test applies to the issue of whether the shackling of a defendant violates the defendant's constitutional rights. See Wilkerson v. Whitley, 16 F.3d 64, 67-68 (5th Cir.), reinstated in relevant part on rehearing en banc, 28 F.3d 498 (1994). As in Wilkerson, in which we determined that, because of substantial evidence of the defendant's guilt, "it was unlikely that the result would have been different" if the defendant was not shackled, id., we are convinced that reasonable jurists would conclude that any error in the trial court's decision to shackle Long was harmless. Given the overwhelming evidence that Long knowingly and intentionally killed the three victims and that he would be dangerous in the future--supplied in part by his own statements--and the limited effect that the shackling could have had in undermining Long's insanity defense,[2] we conclude that no reasonable jurist would determine that the shackling "had [a] substantial and injurious effect or influence in determining the jury's verdict" in either the guilt-innocence or punishment phase

---

[2] We note, as did the panel in Wilkerson, that the jury knew that Long was an inmate "and could have assumed that all inmates were tried in . . . shackles." 16 F.3d at 68.

7

of Long's trial.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).[3]  We therefore decline to issue a CPC on this issue.

**B.  <u>Ake</u> Claim**

Long's second argument is that his rights under the Sixth, Eighth, and Fourteenth Amendments were violated because the trial court failed to appoint a psychiatrist who was independent from the state and not merely neutral, and because the trial court denied his request for an extensive neurological examination.  In support of these propositions, Long relies on <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985).

On December 23, 1986, Long filed a notice of his intent to raise the insanity defense.  In response to this notice, the trial court appointed, without objection from either Long or the state, two psychiatrists, Dr. James Grigson and Dr. E. Clay Griffith, to examine Long regarding the insanity defense and the special punishment phase issues.  Several weeks after these appointments, Long objected to the appointment of Dr. Grigson, claiming that he was biased in the state's favor.  After noting that Long had refused to speak with either Dr. Grigson or Dr.

---

[3] We reject Long's contention that the harmless error test enunciated in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), does not apply because the Texas Court of Criminal Appeals did not explicitly apply the more stringent standard outlined in <u>Chapman v. California</u>, 386 U.S. 18 (1967).  <u>See</u> <u>Hoque v. Johnson</u>, 131 F.3d 466, 499 (5th Cir. 1997) ("<u>Brecht</u>, rather than <u>Chapman</u>, enunciates the appropriate standard for determining whether a constitutional error was harmless in a federal habeas challenge to a state conviction or sentence even though no state court ever made any determination respecting whether or not the error was harmless."), <u>cert. denied</u>, 118 S. Ct. 1297 (1998).

Griffith, the court appointed Dr. Hester, a psychologist who had previously been retained by the defense.

Long then filed a motion for a neurological and neuropsychological examination based on Dr. Hester's recommendation. The trial court questioned Dr. Hester extensively regarding the necessity of this additional testing, and, after Dr. Hester concluded that although he would recommend a referral for further testing he was "very doubtful whether a gross neurological examination would reveal any findings," the court denied the defense request.

On collateral review, the Texas Court of Criminal Appeals rejected Long's claim that this sequence of events violated Long's constitutional rights. The court concluded that the trial court's appointment of two psychiatrists to help determine both Long's sanity at the time of the murders and the likelihood that Long would present a continuing threat to society, as well as the appointment of Dr. Hester, satisfied Ake. Further, the Court of Criminal Appeals found no error in the trial court's refusal to order a neurological examination.

The district court held that Long's claim that he was entitled to the services of an independent, and not just neutral, psychiatrist was barred by the Teague anti-retroactivity doctrine. See Teague v. Lane, 489 U.S. 288 (1989). According to the district court, binding precedent at the time Long's conviction became final for Teague purposes required only the appointment of a neutral psychiatrist, whose opinion and

9

testimony were available both to the state and the defendant, in order to satisfy Ake. Thus, the district court reasoned that extension of the Ake rule to require the appointment of an independent psychiatrist, would announce a new rule of constitutional criminal procedure, and, because it determined that neither exception applied, would violate Teague.

The district court went on to examine Long's related claim that he was entitled to a neurological examination. After implicitly concluding that Ake does not demand an extensive neurological examination whenever the defendant's sanity is likely to be a significant factor at trial, the court analyzed whether, based on the evidence before the trial court at the time it denied Long's motion for the examination, "the expert testimony to be obtained is both critical to the conviction and subject to varying expert testimony," Goodwin v. Johnson, 132 F.3d 162, 188 (5th Cir. 1998) (internal quotation marks omitted). The district court reviewed the interaction between Dr. Hester and the trial court, in which Dr. Hester told the trial court that he recommended that Long receive neurological testing in order to determine with "absolute certainty" whether Long suffered from an organic impairment, but that it was doubtful that Long suffered neurological damage, and that even if he did, "it is sometimes very difficult to say that [a neurological defect] will cause a specific behavior or a specific reaction." The district court ruled that Long failed to demonstrate that the

10

lack of an examination was "critical to the conviction," and therefore denied habeas relief.

We conclude that reasonable jurists would agree with the district court's resolution of both issues. First, neither the state nor Long objected, at least initially, to the two psychiatrists appointed by the state to assist the parties in determining Long's mental state. Further, although Long claimed later that Dr. Grigson, one of the appointed psychiatrists, was biased in favor of the state, Long has never denied that Dr. Griffith, the other psychiatrist, served as an adequate neutral psychiatrist. Thus, Long cannot claim that his lack of financial resources prohibited him from <u>any</u> access to a psychiatrist; instead, he argues that the constitution requires the state to pay for an independent, and not simply neutral, psychiatrist to actively assist in his defense.[4]

This court rejected such a constitutional requirement in <u>Granviel v. Lynaugh</u>, 881 F.2d 185, 191-92 (5th Cir. 1989). In that case, this court discussed a habeas petitioner's claim that Texas's procedure of providing only a neutral, and not independent, psychiatrist violated <u>Ake</u>. We squarely held that "the Texas procedure that provides an indigent defendant with the

---

[4] We note, however, that although the record suggests that Long refused to speak with Dr. Griffith, the record is silent as to the extent of Dr. Griffith's participation with the state (although it is clear that Dr. Griffith did not testify for the state during Long's trial). It is therefore at least conceivable that had Long availed himself of the court-provided access to Dr. Griffith, Dr. Griffith could have played a more active role in Long's defense.

assistance of a court-appointed psychiatrist, whose opinion and testimony is available to both sides, satisfies" the requirements of Ake.  Id. at 191.  We rejected the petitioner's claim in that case that the failure of the state to provide an independent psychiatrist merited habeas relief, and, indeed, we are aware of no binding authority compelling the result that Long now seeks.[5] Thus, reasonable jurists would conclude that precedent at the time Long's conviction became final would not have dictated that the trial court appoint an independent psychiatrist, and that the district court correctly determined that relief on this issue is foreclosed by Teague.[6]  See Graham v. Collins, 506 U.S. 461, 467 (1993) ("[U]nless reasonable jurists hearing petitioner's claim

---

[5] Long relies on a footnote from White v. Johnson, 153 F.3d 197 (5th Cir. 1998), cert. denied, 119 S. Ct. 1048 (1999), as support for the proposition that this circuit has "questioned" the applicability of Granviel.  However, White only questioned Granviel's applicability in situations where the defendant does not place his or her own mental state at issue.  See id. at 200-01 n.2.  Here, as in Granviel, the defendant unquestionably placed his state of mind at the time of the murders at issue. Thus, we are not troubled by our suggestion in White that situations in which a defendant seeks expert assistance only to counteract the state's psychiatrist might raise Fifth Amendment concerns.  See id.  Moreover, White was not decided when Long's conviction became final for Teague purposes.

[6] Long argues that several courts had held that Ake required the appointment of an independent expert before his conviction became final.  In support of this assertion, he cites opinions from the Seventh, Ninth, Tenth, and Eleventh Circuits.  See Liles v. Saffle, 945 F.2d 333 (10th Cir. 1991); Cowley v. Stricklin, 929 F.2d 640 (11th Cir. 1991); Smith v. McCormick, 914 F.2d 1153 (9th Cir. 1990); United States v. Fazzini, 871 F.2d 635 (7th Cir. 1989).  Even if these cases do hold that a neutral expert who is not independent from the state cannot satisfy Ake, a matter on which we do not opine, the trial court in this case would not have felt bound to apply these cases in the face of Granviel's binding precedent.

12

at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, we are barred from doing so now.") (internal quotation marks omitted).

Moreover, we decline to issue Long a CPC to appeal his claim that the trial court's failure to order a neurological examination violated his constitutional rights. Even assuming _arguendo_ that _Ake_ applies to non-psychiatric experts, a question that we expressly declined to resolve in _Goodwin v. Johnson_, 132 F.3d 162, 188 (5th Cir. 1998), we are convinced that any _Ake_ error was harmless.[7] _Cf._ _White v. Johnson_, 153 F.3d 197, 201 (5th Cir. 1998) ("Three other circuits have expressly concluded that _Ake_ error is subject to harmless-error analysis, and we now join them."), _cert. denied_, 119 S. Ct. 1048 (1999). Our review of the record, especially the interaction between the trial court and Dr. Hester, convinces us that reasonable jurists would conclude that the lack of additional neurological testing did not have a substantial and injurious impact on the jury's decision in either the guilt-innocence or punishment phase of Long's trial.

---

[7] If _Ake_ does not apply to neurological testing, as at least one district court in addition to the district court has concluded, _see_ _Davis v. Singletary_, 853 F. Supp. 1492, 1540 n.39 (M.D. Fla. 1994), _aff'd on other grounds_ 119 F.3d 1471 (11th Cir. 1997), _cert. denied_, 118 S. Ct. 1848 (1998), we are convinced, for essentially the same reasons that any _Ake_ error is harmless, that all reasonable jurists would agree with the district court's conclusion that the lack of extensive neurological examination was not critical to Long's conviction or the jury's decision to answer affirmatively to the special sentencing questions. _See_ _Goodwin_, 132 F.3d at 188 (stating to be entitled to non-psychiatric expert assistance, assistance must be "both critical to the conviction and subject to varying expert opinion") (internal quotation marks omitted).

13

As both the Texas state courts and the district court recognized, Dr. Hester told the trial court of the low probability that additional neurological testing would inform the jury's decision. Specifically, Dr. Hester stated:

> In terms of my diagnosis of the client at this . . . time, I did not see any gross features which would indicate neurological damage, which I have cited in the report.
> Furthermore, I would be very doubtful whether a gross neurological examination would reveal any findings. In terms of CT scans or EEGs, the likelihood is that the client will probably come out clean on these areas.
> But if we want to look with absolute certainty whether or not there is any organic impairment, then those particular tests would be necessary to make that determination. It goes one step further that even if we did find some level of organic impairment, whether or not that would be a significant issue regarding the issues before the Court is another issue.

After being asked by counsel if he could "give the Judge any number as to how much more certainty would be provided" if Long were tested, Dr. Hester responded:

> On two levels. It would give the Court a hundred percent certainty that there was or was not a significant organic condition[] operat[ing]. Even if such an organic condition were found, the Court would not be [] substantial[ly] enhance[d] in terms of [the] issue[] before the Court [of whether] that particular level of impairment would cause the behavior.

Dr. Hester further stated that his findings on the relationship between any organic damage and behavior "would not be enhanced by much" given additional neurological testing, unless that testing were to reveal "major brain damage," which Dr. Hester stated was unlikely.

Given these statements by Dr. Hester, the only expert that recommended the neurological examination, we are comfortable that

14

Long has not made a substantial showing of the denial of a federal right with respect to this issue. Although Dr. Hester indicated that he recommended additional testing "in the interest of being a scientist," Dr. Hester made it clear that he doubted that additional testing would have any impact, much less a substantial impact, on the jury's decisionmaking process. Because we are convinced that reasonable jurists would conclude that the trial court's denial of Long's motion for a neurological examination, if it constituted error, was harmless, we deny Long a CPC on this issue. See Walker v. Attorney General, 167 F.3d 1339, 1348 (10th Cir. 1999) (concluding that any error resulting from trial court's denial of neurological examination was harmless because "the lack of the additional recommended testing had no substantial injurious impact on the jury's decision").

## C. Trial Court's Failure to Hold a Competency Hearing

Long's third claim is that because "the trial judge heard a wealth of evidence raising a bona fide doubt" as to Long's competency, the trial judge erred in failing to conduct a competency hearing pursuant to Pate v. Robinson, 383 U.S. 375 (1966), and Drope v. Missouri, 420 U.S. 162 (1975).

The Texas Court of Criminal Appeals rejected this claim on collateral review. According to the court:

> In the present case, [Long] testified twice at the guilt-innocence stage of trial; his testimony was focused and lucid. There was no question that he knew exactly what he was saying, had accurate recall of the events surrounding the murders, and was able to participate in his own defense. That [Long] disagreed with his attorneys, changed his plea, or said exactly what he thought about the proceedings as the trial

15

progressed is not a sign of "incompetency," despite counsel's insistence that applicant is "insane" and suffers "brain damage."

In sum, the trial judge was correct in his determination that there was no need for a competency hearing in [Long's] case, nor was there any need for a jury determination of the issue. There was <u>no</u> evidence, not even a "scintilla," that [Long] could not consult with his attorneys about his defense, or that [Long] did not understand the nature of the proceedings against him. . . . No error is shown.

The district court ruled that Long had not rebutted the presumption of correctness afforded these state court findings of fact under the pre-AEDPA § 2254(d), and denied relief, concluding that Long failed in his burden of showing that the trial court's failure to hold a competency hearing merited habeas relief.

A trial judge must <u>sua sponte</u> conduct an inquiry into a defendant's mental capacity "if the evidence raises a bona fide doubt as to the defendant's competency." <u>Porter v. Estelle</u>, 709 F.2d 944, 949 (5th Cir. 1983). If the trial judge fails to hold a competency hearing "after receiving sufficient information to raise a reasonable doubt as to competency, a procedural due process violation, commonly known as a <u>Pate</u> violation, occurs." <u>Wheat v. Thigpen</u>, 793 F.2d 621, 629 (5th Cir. 1986). To prevail on a <u>Pate</u> claim, a habeas petitioner must make a "clear and convincing showing of the existence of a real, substantial and legitimate doubt as to his mental capacity." <u>Id.</u> (internal quotation marks and alterations omitted). We generally refer to three factors in determining whether a petitioner has made such a showing: the existence of a history of irrational behavior, the

16

defendant's demeanor at trial, and prior medical opinions. See Drope, 420 U.S. at 180; Porter, 709 F.2d at 950 n.3.

Long asserts that the trial court should have had a bona fide doubt about his competency because: (1) Dr. Hester testified that there was a substantial probability that he was insane at the time that he committed the murders; (2) he offered a "bizarre" explanation of the murders; (3) he was on a "self-destructive mission" to receive the death penalty; (4) he changed his plea to guilty; and (5) the prosecution, out of "an abundance of caution," asked for a competency hearing during the punishment phase of the trial.

We agree with the district court that Long has failed to rebut the presumption of correctness that we must afford the state court findings of fact on this issue.[8] These arguments are insufficient to rebut the state court's factual finding that

---

[8] We reject Long's contention that the factual findings made by the Texas state court cannot be afforded deference under the pre-AEDPA § 2254(d) because the court simply adopted the state's brief as its order. Although Long is correct that "[f]indings based solely on a paper record are not necessarily entitled to a presumption of correctness," Nethery v. Collins, 993 F.2d 1154, 1157 n.8 (5th Cir. 1993), here we apply the presumption because Long has failed to show that such deference is not appropriate. We are comforted by the fact that the same trial judge who presided over Long's trial considered Long's state habeas petition. See Armstead v. Scott, 37 F.3d 202, 207-08 (5th Cir. 1994); see also Cuppett v. Duckworth, 8 F.3d 1132, 1141 n.7 (7th Cir. 1993) (en banc) (stating that pre-AEDPA § 2254(d) requirement of hearing on the merits does not "'specify any procedural requirements that must be satisfied . . . other than that the habeas applicant and the State or its agent be parties to the state proceeding and that the state-court determination be evidenced by a written finding, written opinion, or other reliable and adequate written indicia'") (quoting Summer v. Mata, 449 U.S. 539 (1981)) (internal quotation marks omitted).

17

there was no evidence suggesting that Long was not competent during his trial. First, although Dr. Hester did testify that it was possible that Long was insane at the time of the murders, this testimony did not address Long's state of mind during the trial--the only relevant time period under Pate. See McInerney v. Puckett, 919 F.2d 350, 352 (5th Cir. 1990) (stating that evidence of petitioner's incompetency before trial "does not mean he was incompetent at the time he stood trial"); cf. Medina v. California, 505 U.S. 437, 449 (1992) (stating that "a plea of not guilty by reason of insanity . . . presupposes that the defendant is competent to stand trial"). Similarly, even if it is true that Long, shortly after he committed the murders, would not confess to the killings unless he was promised that the state would seek the death penalty, this does not evidence his mental state at the time of his trial. Further, Long's argument that the trial judge should have been aware of competency issues at trial because of Long's "bizarre" explanation of his offense and his decision to change his plea fails to rebut the presumption of correctness that we must afford the state court's finding that there was no evidence suggesting that Long was incompetent during his trial. Cf. Autry v. McKaskle, 727 F.2d 358, 362-63 (5th Cir. 1984) (rejecting claim that petitioner's desire to abandon appeal in death penalty case evidenced incompetency); Johnson v. Estelle, 704 F.2d 232, 239 (5th Cir. 1983) (noting that "a seemingly irrational crime" does not provide trial court notice of defendant's possible incompetency). Lastly, Long's

18

contentions that the state requested a competency hearing because of its concerns about Long's competency and that Long's own attorney doubted his competency are belied by a careful review of the record. It is clear from the record that the state "advised" the trial judge to conduct a competency hearing only out of an "abundance of caution." Moreover, Long's attorneys stated that Long was competent to stand trial, even if he was insane when he committed the killings. The court therefore declined to conduct a competency hearing, noting that "the Court hasn't seen any evidence of incompetency." We conclude that Long has failed to rebut the state court's findings in such a way to convince a reasonable jurist that he could prevail on his Pate claim, and we therefore decline to issue Long a CPC.

## D.  Long's Competency at Trial

Long's fourth argument is closely related to his third. He argues that, in violation of Dusky v. United States, 362 U.S. 402 (1960) (per curiam), he was incompetent to stand trial, and that he was entitled to an evidentiary hearing in front of the district court to prove his allegation of incompetence. In light of our discussion of Long's Pate claim, we can easily dispose of Long's contention that a reasonable jurist could conclude that Long lacked sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or that Long lacked a rational as well as factual understanding of the proceedings against him. See id. at 402.

19

As discussed supra, the Texas Court of Criminal Appeals endorsed the state trial court's factual finding that Long was able to participate in his own defense and that he was not incompetent at the time of his trial and thus denied habeas relief to Long on this claim. The district court, as it did for Long's Pate claim, relied on these factual findings and concluded that federal habeas relief was not warranted. Because Long has provided no evidence of his incompetence rebutting the presumption of correctness that we must afford the state factual findings, we must conclude that no reasonable jurist could find that Long is entitled to collateral relief on this issue. Accordingly, this issue does not warrant the issuance of a CPC. Furthermore, the district court did not err in denying Long's request for an evidentiary hearing on this issue. The law is clear that a district court need not hold an evidentiary hearing where, as here, the record from the state court is adequate to dispose of the claim. See Weaver v. Puckett, 896 F.2d 126, 127 (5th Cir. 1990); Joseph v. Butler, 838 F.2d 786, 788 (5th Cir. 1988).

**E. Penry Claims**

Long's fifth argument is based on Penry v. Lynaugh, 492 U.S. 302 (1989). He argues that the jury was foreclosed from considering evidence of Long's abusive childhood and mental problems as mitigating evidence during the punishment phase of his trial. Long acknowledges the relevant Penry framework: we first must determine whether the evidence Long points to is

20

constitutionally relevant mitigating evidence, and, if it is, then we must consider whether this evidence was beyond the effective reach of the jurors. See Davis v. Scott, 51 F.3d 457, 460 (5th Cir. 1995). Mitigating evidence is only constitutionally relevant if it indicates "(1) a uniquely severe permanent handicap[] with which the defendant was burdened through no fault of his own, and (2) that the criminal act was attributable to this severe permanent condition." Id. at 460-61 (internal quotation marks and citation omitted).

The Texas Court of Criminal Appeals rejected this claim on habeas review. The court concluded that each of the allegedly mitigating factors that Long advanced was within the effective reach of the jury, because, citing Johnson v. Texas, 509 U.S. 350 (1993), there was no reasonable probability that the punishment phase instructions precluded the jury's consideration of relevant mitigating evidence. The district court similarly declined to grant a writ of habeas corpus to Long on this issue. After carefully analyzing the allegedly mitigating evidence Long offered, the court concluded that the jury had not been foreclosed from considering any constitutionally relevant evidence in violation of Penry.

We review Long's Penry claim de novo. See Davis, 51 F.3d at 459; Madden v. Collins, 18 F.3d 304, 306 (5th Cir. 1994). After due consideration of Long's contention that the jury could not properly consider potentially mitigating evidence, we conclude that Long has failed to make a substantial showing of the denial

21

of a federal right with respect to this issue.  Long alleges that the jury could not give mitigating effect to evidence regarding his troubled childhood and evidence that he suffered from alcoholic hallucinosis, paranoid ideations, borderline personality disorder, and intermittent explosive disorder.

We agree with the district court that Long's Penry claim with respect to the evidence concerning his abusive childhood fails because it is not constitutionally relevant in light of Madden v. Collins, 18 F.3d 304, 308 (5th Cir. 1994).  "[F]or evidence to have mitigating relevance to the special issues, there must be a nexus between the mitigating evidence and the criminal act."  Davis, 51 F.3d at 461.  As in Madden, Long presented no evidence at trial demonstrating such a nexus between the abuse allegedly suffered by Long as a child and the murders. See Madden, 18 F.3d at 308 (concluding that petitioner's Penry claim based on an abusive childhood failed because petitioner failed "to produce substantial evidence that his childhood abuse . . . had such a psychological effect on him that it led to the criminal act").

The only evidence that Long presented at trial relating to his childhood that he linked to the crimes at all was his sensitivity to smells, which Long's counsel argued triggered an intermittent explosive disorder.  Dr. Hester testified at Long's trial that Long was unusually sensitive to certain odors as a result of associating "foul odors" with his mother's death. However, Dr. Hester refused to expand his diagnosis of Long to

22

include an intermittent explosive disorder, and, significantly, he did not link this disorder to Long's crimes. The conclusional allegation made by Long's counsel that the murders were triggered by a smell at the victims' house that caused an intermittent explosive disorder is insufficient to persuade a reasonable jurist that the jury was foreclosed from considering constitutionally relevant mitigating evidence with respect to his childhood or with respect to his alleged intermittent explosive disorder. See Davis, 51 F.3d at 462 ("Needless to say, conclusory assumptions do not create a nexus.").

Moreover, with respect to the two other mental disorders identified by Long, paranoid ideations and a borderline personality disorder, Long also put forth no evidence during trial that he either had these disorders or that these disorders were at all related to his commission of the murders. As the district court made clear in its opinion denying relief on this issue, "Dr. Hester did not, as Long now argues, diagnose Long as having each of the four disorders that he cites in his petition, or opine that the murders were directly attributable to Long's mental illnesses, individually or in some combination." Rather, Dr. Hester instead stated that Long had an antisocial personality disorder,[9] and that Long was likely suffering from alcohol

---

[9] Long does not argue that the jury was foreclosed from considering evidence of his antisocial personality disorder as a mitigating factor during its sentencing deliberation. We note that we rejected the proposition that an antisocial personality disorder could form the basis of a Penry claim in Demouchette v. Collins, 972 F.2d 651, 653 (5th Cir. 1992).

23

withdrawal at the time of the killings.  Long's claim that the jury was foreclosed from considering evidence of these disorders as mitigating evidence thus fails to raise a substantial showing of the denial of a federal right.

We are also convinced that no reasonable jurist could conclude that Long's Penry claim based on his reaction to alcohol (or lack of alcohol) has merit.  First, contrary to Long's allegation, Dr. Hester did not conclude that Long suffered from alcohol hallucinosis.  Dr. Hester did testify that it was very likely that Long was going through alcohol withdrawal on the day of the murders, and, although he did state that it was a "possibility" that the withdrawal triggered alcohol hallucinosis, he would not alter his diagnosis that Long suffered only from an antisocial personality disorder.  Dr. Hester also testified that Long had control over his choice to drink, and that he developed a dependency on alcohol through his own actions.  As the district court correctly concluded, this evidence cannot give rise to a Penry violation, as "self-inflicted chronic drug and alcohol abuse and the resulting arrested emotional development do not constitute a unique handicap with which the defendant was burdened through no fault of his own."  Tucker v. Johnson, 115 F.3d 276, 282 (5th Cir.) (internal quotation marks omitted) (denying a CPC on petitioner's Penry claim based on "arrested emotional development" allegedly caused by alcohol abuse), cert. denied, 118 S. Ct. 605 (1997).

24

We are therefore unconvinced that Long has made a substantial showing of the denial of a constitutional right on his <u>Penry</u> claim. Despite Long's assertions to the contrary, Dr. Hester's testimony simply does not support Long's allegation that he suffered from these psychological ailments, or even if he did, that these disorders in any way caused Long to commit the murders. We therefore deny Long a CPC to appeal this issue.

**F. Evidence of Additional Murders During Punishment Phase**

Long's final claim is that during the punishment phase of the trial, the prosecution knowingly relied on false, misleading, and unreliable evidence concerning two murders that Long confessed to committing. The prosecution introduced evidence, in the form of the testimony of investigatory officers and Long's confessions, concerning these two unadjudicated murders.

The first murder took place in Bay City, Texas in 1983. Deputy Sheriff Nickey Don Hale testified concerning Long's alleged involvement in this murder during the punishment phase. Hale testified that Long was initially arrested for this murder, that there was no physical evidence to prove that Long started the fire that killed the victim, and that "the case was never tried due to the lapse of time." Long argues that the prosecution knowingly allowed misleading testimony concerning this murder because it knew that a grand jury had refused to indict Long for this murder on two separate occasions.

The state habeas court denied relief on this issue. The Texas Court of Criminal Appeals concluded that, in light of the

25

fact that Long's confession to the Bay City murder was properly introduced during the punishment phase, any possible false testimony concerning the reasons that the case was never prosecuted was immaterial. The district court agreed, and, deferring to the trial court's unrebutted factual finding that Long was competent when he confessed to the Bay City murder and that the confession was voluntary, denied relief.

Although it is true as a general rule that "the State is not permitted to present false evidence or allow the presentation of false evidence to go uncorrected," Moody v. Johnson, 139 F.3d 477, 484 (5th Cir.) (citing Giglio v. United States, 405 U.S. 150, 153 (1972)), cert. denied, 119 S. Ct. 359 (1998), a habeas petitioner may not prevail on such a claim unless he or she demonstrates that (1) the testimony was actually false, (2) the state knew it was false, and (3) the testimony was material, see Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996). Testimony is not material in this setting unless there is a "reasonable likelihood" that the false evidence could "have affected the judgment of the jury." Giglio, 405 U.S. at 154 (internal quotation marks omitted).

It is uncontested that Long confessed to the Bay City murder. Although Long now claims that the only reason that he confessed was his desire to receive the death penalty, Long has offered no evidence in any form suggesting that the state knew that the confession was false, or even that the confession was

false.[10]  Thus, a reasonable jurist could only conclude, as did the able district judge, that Long's confession to the Bay City murder did not violate Long's due process rights.  Further, in light of the fact that the jury heard Long confess to the Bay City murder, we are convinced that Long has not made a substantial showing that the question of why Long was not prosecuted for this crime was material, i.e., that had the jury known that Long had not been prosecuted because the grand jury refused to indict him, there was a reasonable likelihood that its answers to the special punishment issues would have been different.  We therefore decline to issue Long leave to appeal this issue.

The prosecution also presented evidence during the punishment phase of Long's trial regarding a murder that occurred in San Bernadino, California, in November 1978.  Again, the state introduced testimony concerning the murder and the jury also heard a police officer read Long's confession to the murder.  Long objects to a portion of the officer's testimony in which he testified that he was unaware whether Long's fingerprints were discovered at the scene and that he was unaware whether a witness had given a physical description of the murderer.  Long claims that the prosecutor was fully aware an eyewitness had provided

---

[10] Before the district court, Long requested an evidentiary hearing to establish the truth of his assertion that a grand jury had refused on two occasions to indict him for the Bay City murder.  Long did not specifically refer to any facts that would create a factual issue that the prosecution knew that his confession was false.

the San Bernadino police with a physical description of the murderer that did not match Long and that Long's fingerprints were not found at the crime scene.

Long did not raise this claim in his state habeas petition. He argued to the district court that his failure to raise this claim was based on the state court's refusal to allow additional time for his new habeas attorney to prepare his habeas petition and because an assistant district attorney impeded his efforts to investigate the San Bernadino murder. The district court concluded that these factors were insufficient to demonstrate cause for Long's failure to exhaust his state court remedies and therefore ruled that Long had procedurally defaulted this claim.

We are inclined to agree with the district court's reasoned conclusion that Long has failed to allege sufficient facts to excuse his failure to bring this claim to the state courts. We address it, however, because Long's contention so clearly lacks merit. See Glover v. Hargett, 56 F.3d 682, 684 (5th Cir. 1995). We note that although Long argues that an evidentiary hearing is warranted on this issue, like the Bay City murder discussed supra, he claims only that the specific statements concerning the physical description and fingerprints are false, not that his confession was false.

It is abundantly clear that reasonable jurists would conclude that this claim lacks merit for substantially the same reasons as his claim regarding the Bay City murder. Again, the jury heard Long's confession to the San Bernadino murder, so the

28

testimony regarding Long's fingerprints and whether an eyewitness had given a physical description of the assailant were clearly immaterial in light of the confession.  Moreover, the testifying officer did not state that no physical description of the assailant was given; when asked if he obtained such a description, the officer merely replied that "I never interviewed anybody at the scene.  I was busy doing the diagram and taking measurements of the location, so I didn't talk to anybody out there."  The testifying officer's statement regarding whether Long's fingerprints were present at the scene was also circumscribed--the officer only stated that, to his knowledge, Long's fingerprints were not found.  We therefore conclude, as we did with regard to the testimony concerning the Bay City murder, that no reasonable jurist could conclude that the state elicited material testimony that it knew to be false with respect to the San Bernadino murder.  Long has failed to make a substantial showing of a due process violation, and we decline to issue a CPC.

### III.  CONCLUSION

For the foregoing reasons, we DENY Long's application for a CPC.