**Ex parte Laroyce Lathair SMITH, Applicant.**

No. 74228.

Court of Criminal Appeals of Texas.

April 21, 2004.

Jan E. Hemphill, Dallas, and Jordan M. Steikder, Austin, for Appellant.

Bill Hill, District Attorney, Dallas, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

COCHRAN, J., delivered the opinion of the Court, joined by KELLER, P.J., MEYERS, WOMACK and JOHNSON, JJ.

We deny habeas corpus relief in this case because there was no constitutional

infirmity in applicant's capital-murder punishment-phase jury instructions. First, applicant's mitigation evidence was not *Penry I* evidence; therefore, the jury could give effect to this evidence within the scope of the two special issues. Second, we find no error in the trial court's supplementary nullification instruction. I.

In 1991, a Dallas County jury convicted applicant of capital murder for the robbery-murder of Jennifer Soto. During the punishment phase, applicant introduced evidence that he had a difficult family life as a child and that he was mentally slow, though not mentally retarded. Under the law in effect at the time of the trial, the jury was then given two special issues during the punishment phase: First, was the killing deliberate? And second, does the defendant pose a continuing danger to others? Because this trial took place during that two-year hiatus between the Supreme Court's decision in *Penry I*[1] and the Texas Legislature's enactment of a new statutory special issue in response to *Penry I*,[2] the trial judge also gave the jury a non-statutory nullification instruction. That supplemental instruction read:

> You are instructed that you shall consider any evidence which, in your opinion, is mitigating. Mitigating evidence is evidence that reduces the Defendant's personal or moral culpability or blameworthiness, and may include, but is not limited to, any aspect of the Defendant's character, record, background, or circumstances of the offense for which you have found him guilty. Our law does not specify what may or may not be considered as mitigating evidence. Neither does our law provide a formula for determining how much weight, if any, a

mitigating circumstance deserves. You may hear evidence which, in your judgment, has no relationship to any of the Special Issues, but if you find such evidence is mitigating under these instructions, you shall consider it in the following instructions of the Court. You, and each of you, are the sole judges of what evidence, if any, is mitigating and how much weight, if any, the mitigating circumstances, if any, including those which have no relationship to any of the Special Issues, deserves.

> In answering the Special Issues submitted to you herein, if you believe that the State has proved beyond a reasonable doubt that the answers to the Special Issues are "Yes," and you also believe from the mitigating evidence, if any, that the Defendant should not be sentenced to death, then you shall answer at least one of the Special Issues "No" in order to give effect to your belief that the death penalty should not be imposed due to the mitigating evidence presented to you. In this regard, you are further instructed that the State of Texas must prove beyond a reasonable doubt that the death sentence should be imposed despite the mitigating evidence, if any, admitted before you.

> You are instructed that you may deliberate as a body about mitigating circumstances, but you are not required to reach a unanimous verdict as to their existence or weight. When you vote about the Special Issues, each of you must decide for yourself whether mitigating circumstances exist and, if so, how much weight they deserve.

---

1. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (*Penry I*).

2. *See Robertson v. Cockrell,* 325 F.3d 243, 249 (5th Cir.) (en banc) (noting that "dozens" of capital trials were conducted during this "hiatus" using an extra-statutory *Penry I* nullification instruction), *cert. denied,* —— U.S. ——, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003).

These supplemental instructions explicitly told the jury that:

1. It "shall" consider any and all mitigating evidence;
2. The mitigating evidence might, but need not, relate to the defendant's character, record, background, or any circumstances of the offense;
3. Mitigating evidence is any evidence which reduces the defendant's personal or moral culpability or blameworthiness;
4. Mitigating evidence need not have any relationship to either of the Special Issues;
5. The jurors need not be unanimous about what specific evidence each one considers mitigating;
6. The jurors each decide what evidence is mitigating and how much weight to give it;
7. If the jury finds, from the mitigating evidence, that the defendant should not be sentenced to death, then it "shall" answer one of the Special Issues "No"; and
8. The State must prove, beyond a reasonable doubt, that the death penalty should be imposed despite the mitigating evidence.

Based upon the evidence admitted at trial and the trial judge's instructions, the jury found that the State carried its burden on the special issues [3] and proved, beyond a reasonable doubt, that a death sentence should be imposed despite appli-

cant's mitigating evidence. Therefore, the trial judge sentenced applicant to death.

On direct appeal, applicant claimed that, under *Penry I*, Article 37.071 was unconstitutional as applied to him because the jury was unable to give effect to his mitigating evidence in answering the special issues. We rejected this claim and held that, regardless of whether applicant's mitigating evidence was beyond the scope of the two statutory special issues, the judge's extensive supplemental instruction provided a sufficient vehicle for the jury to consider all of applicant's mitigating evidence.[4]

Applicant filed an original writ of habeas corpus in the convicting court in 1998, but we dismissed that writ as untimely filed. After the Legislature revised Article 11.071, § 4A, to permit applicant to file a new writ, he timely filed another writ and now claims that the trial judge's supplemental "nullification" instructions were unconstitutional under *Penry II*.[5] Applicant argues that his supplemental jury instructions were "virtually identical" to those given in *Penry II*, and his mitigation evidence was similar to that offered in *Penry II*. Therefore, he claims, he is entitled to relief under *Penry II*.

We disagree. First, the present supplemental instructions are similar to those given in *Penry II* only to the extent that both were "nullification" instructions. Otherwise, they are dissimilar in ways that render the present instruction constitu-

---

**3.** These special issues were:

(1) Do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant, LaRoyce Lathair Smith, that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

(2) Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, LaRoyce Lathair

Smith, would commit criminal acts of violence that would constitute a continuing threat to society?

**4.** *Smith v. State*, No. 71,333 slip op. at 10–11 (Tex.Crim.App. June 22, 1994) (not designated for publication).

**5.** *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (*Penry II*).

tionally sufficient. Second, applicant's evidence of an unhappy childhood and as a slow learner is simply not the "two-edged sword" type of evidence contemplated in either *Penry I* or *Penry II*. Applicant might be entitled to relief only if the Supreme Court intended to hold, in *Penry II*, that all nullification instructions are constitutionally infirm in all cases in which the defendant offers any mitigation evidence. We do not read *Penry II* that broadly, and neither did the Fifth Circuit in its *en banc* decision in *Robertson v. Cockrell*.[6] If Robertson (whose mitigation "evidence-in quality and quantity-does not match Penry's")[7] was not entitled to relief under *Penry II*, then applicant, whose mitigation evidence does not rise to the level found in *Penry I*, is likewise not entitled to relief.

## II.

### A. *Penry I* mitigation evidence and the *Penry II* mitigation instruction issue.

In *Penry I*, the Supreme Court held that, although the Texas statutory special issues are a facially constitutional and sufficient framework, those special issues may sometimes be insufficient to protect a defendant's right to have the jury consider and give effect to certain types of mitigating evidence.[8] Penry's mitigation evidence was that he had suffered severe childhood abuse and that he was mentally retarded. With evidence of this nature and severity, the special punishment issues might be insufficient in two ways.

First, Penry's evidence showed that, as a consequence of these two severe problems, he had a diminished ability "to control his impulses or to evaluate the consequences of his conduct."[9] The severity of Penry's impairment suggested a possible lack of full moral culpability, but the Supreme Court reasoned that, without a definition of "deliberateness" in the first special issue which would encompass a diminished moral culpability, the jury might not believe it could give full mitigating effect to this evidence.[10]

Second, the type of mitigation evidence offered by Penry was a "two-edged sword"; while it diminished his personal moral culpability, it increased the likelihood that he would constitute a continuing threat to society under the "future dangerousness" special issue.[11] Precisely the same evidence that made Penry potentially less morally aware and less culpable made him considerably more dangerous to others. The Supreme Court concluded that Penry had a constitutional right to jury instructions that would provide a vehicle for the jury to express its "reasoned moral response" to his double-edged mitigation evidence and to decline to impose the death penalty if it believed Penry's moral culpability was less because he had suffered from severe childhood abuse and mental retardation.[12] Because the barebones jury instructions did not provide a sufficient vehicle for the jury, the Supreme Court reversed Penry's death sentence and remanded the case for a new punishment trial.[13]

---

6. *Robertson*, 325 F.3d at 249–58.

7. 325 F.3d at 244.

8. *Penry I*, 492 U.S. at 315–37, 328, 109 S.Ct. 2934.

9. *Id.* at 322.

10. *Id.* at 323.

11. *Id.* at 324.

12. *Id.* at 328.

13. *Id.*

The 1989 decision in *Penry I* created grave difficulties for Texas trial courts in capital murder cases. As the Fifth Circuit noted, trial courts:

> could not craft entirely new jury interrogatories, as the precise questions had been written by the state legislature. Nor could they suspend the trials in anticipation of legislative remediation, as the legislature would not meet again until 1991 and its reaction was unknown. Hoping to provide timely and *Penry*-compliant trials, the courts generally chose to cure the perceived deficiencies in the jury interrogatories by issuing, when appropriate, the supplemental instruction described above. This the Texas courts did from the pronouncement of *Penry I* to September 1, 1991, when the amended statute went into effect.[14]

Penry himself was retried during this legislative interregnum. And the trial judge gave the jury supplemental "nullification" instructions.[15] Once again, the Supreme Court reversed Penry's death sentence, holding that the supplemental instructions still failed to give the jury an adequate vehicle by which they could consider and give effect to Penry's mitigation evidence of severe childhood abuse and mental retardation.[16] Furthermore, the Court held that the structure of the supplemental instruction, telling the jury to change its answer to one of the special-issue questions from a truthful "Yes" to an untruthful "No" simply to avoid imposing the death penalty, forced conscientious jurors to violate their oath to answer the questions truthfully.[17] Penry's death sentence was again reversed and the case returned for a third punishment trial.

Significantly, however, the Supreme Court did not state, in either *Penry I* or *Penry II*, that the Texas special-issue scheme was an insufficient vehicle for all mitigation evidence, or that all supplemental nullification instructions were necessarily unconstitutional vehicles for a jury's consideration of mitigating evidence.

## B. The two special issues provided applicant's jury with a constitutionally sufficient vehicle to give effect to his mitigating evidence.

■ The first question before this Court is whether the two special issues given in this case provided a sufficient vehicle for the jury to give effect to applicant's mitigating evidence of a troubled childhood and of his somewhat limited mental ability.

---

**14.** *Robertson*, 325 F.3d at 248–49.

**15.** Those instructions were:

> You are instructed that when you deliberate on the question posed in the special issues, you may consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide

> how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues.

> *See Penry II*, 532 U.S. at 790, 121 S.Ct. 1910.

**16.** *Id.* at 797, 121 S.Ct. 1910.

**17.** *Id.* at 798–801, 121 S.Ct. 1910.

Given the quantity and quality of that evidence, we conclude that they did.

First, applicant offered evidence of his limited mental capacity. Applicant's mother testified that applicant was "a slow learner" in school. He had an I.Q. of 78 and possible organic learning disabilities. Applicant attended special-education classes and his behavior was often noted as "exemplary," but he dropped out of school in the ninth grade at the age of eighteen. He committed this capital murder at the age of nineteen. This is evidence of below-average educational abilities and attainment, but it does not reflect even mild mental retardation, nor does it qualify as a severe handicap.

Second, applicant offered evidence of his difficult family background. His father had been in prison for robbery, was involved with a motorcycle gang, consorted with other women, used alcohol and drugs, and stole from his own family. This situation upset applicant. Because the family did not have a lot of money, applicant began looking for work as a young teenager. According to defense witnesses, applicant suffered because of his father's thefts from the family and from a lack of money in the home. This evidence sets out a less-than-ideal family background. But, like Robertson, whose natural father was an abusive alcoholic, applicant does not—with his unfortunately not-atypical evidence of an adverse childhood—raise a *Penry* issue.[18] While it may be of some mitigating value, it is not a "severe" handicap under *Penry I*.

 *Penry I* does not require a special mitigation instruction, apart from the two statutory special issues, for any and all mitigating evidence, regardless of its strength, quantity or quality. For more than ten years, the Fifth Circuit has drawn the line between *Penry* and non-*Penry* mitigation evidence under the test of whether the defendant's criminal act was "due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own." [19] This test takes into account the four principles set out by the Supreme Court in *Penry*: voluntariness, permanence, severity, and attribution.[20] If a disability is acquired involuntarily,[21] is of a permanent rather than transient nature,[22] is severe in

---

**18.** *See Robertson,* 325 F.3d at 245, 252–53.

**19.** *Id.* at 251 (quoting *Graham v. Collins,* 950 F.2d 1009, 1029 (5th Cir.1992) (en banc), *aff'd,* 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993)). The Supreme Court granted certiorari in *Tennard v. Cockrell,* 284 F.3d 591 (5th Cir.2002), *cert granted sub nom. Tennard v. Dretke,* — U.S. — (2004) (No. 02–10038), to address whether the Court's reasoning in *Penry II* applies when evidence is admitted that the defendant is mentally "slow," but the capital crime cannot be attributed to that mental slowness. The disposition of that case, however, is not dispositive of applicant's claim. First, we do not read *Penry II* to expand upon the nature and scope of evidence that requires any additions to, or modification of, the pre–1991 Texas special issue scheme. *See Robertson,* 325 F.3d at 255–57. Second, applicant's mitigation evidence is more akin to that in *Robertson* than

the mentally-slow evidence in *Tennard.* In other words, applicant's mitigating evidence did not show a severe handicap, much less a "uniquely" severe one.

**20.** *Robertson,* 325 F.3d at 251.

**21.** Thus, voluntary drug abuse, for example, does not qualify as constitutionally significant *Penry* evidence which requires a vehicle outside the scope of the statutory special issues. *See Barnard v. Collins,* 958 F.2d 634, 639 (5th Cir.1992).

**22.** Youth, although it may be mitigating in a particular case, is not a permanent disability; those who survive it will outgrow it. Thus, a jury does not normally need any additional instructional vehicle, beyond the statutory special issues, to consider youth as a mitigating factor. *See Graham,* 950 F.2d at 1014.

its impact upon the person,[23] and is at least a partial cause or explanation of the criminal act,[24] then a defendant is entitled to a vehicle by which to give effect to that evidence—either supplementary instructions or a special mitigation issue.

Here, applicant merely argues that he presented "significant mitigating evidence that was virtually indistinguishable from Penry's and thus undeniably beyond the scope of the special issues." This evidence, however, is not qualitatively or quantitatively similar to that offered by Penry.[25] A "slow learner" is not, *ipso facto*, mentally retarded. A person who attends special-education classes does not, by virtue of that fact alone, suffer a severe disability. A person who drops out of school in the ninth grade is not necessarily the victim of a permanent disability. Similarly, one who has a disadvantaged background or a difficult childhood is not necessarily the victim of a severe and permanent disability. Furthermore, applicant fails to explain how or why this evidence affected his ability to control or evaluate his conduct. Undoubtedly, the vast majority of Americans have suffered some difficulties, disadvantages, or dire disappointments in life. Generally, people are able to survive, surmount, and learn from those negative experiences.

Moreover, applicant fails to show how being a slow learner and having been burdened by a feckless father impacted his later behavior or criminal conduct.[26] Applicant offered no evidence of any link or nexus between his troubled childhood or his limited mental abilities and this capital murder. Although we need not decide whether *Penry* requires a defendant to show that the crime is directly "attributable" to the severe handicap, *Penry* surely stands for the proposition that there must be at least a logical, reasonable evidentiary relationship established between the disability and the defendant's criminal conduct or his moral blameworthiness. Applicant has failed to establish any such evidentiary link.

Furthermore, applicant has failed to show that any mitigating quality of his family background and mental-limitations evidence could not be fully encompassed by the two statutory special issues. Applicant's mental limitations were surely relevant to whether he acted deliberately in

---

**23.** For example, dyslexia and an unfortunate childhood are not so severe that they require any additional instructional vehicle under *Penry I. See Madden v. Collins*, 18 F.3d 304, 308 (5th Cir.1994); *Barnard*, 958 F.2d at 639. On the other hand, a defendant who suffers from chronic paranoid schizophrenia does suffer a severe mental condition that might very well contribute to his criminal actions. *See Bigby v. Cockrell*, 340 F.3d 259, 273 (5th Cir.2003).

**24.** For example, childhood abuse might cause demonstrable psychological effects upon a person and the capital offense act might be attributable to, or at least related to, those specific psychological effects. *See Madden*, 18 F.3d at 308. *See generally, Robertson*, 325 F.3d at 252–53. *Compare Blue v. Cockrell*, 298 F.3d 318, 321–22 (5th Cir.2002) (parental abandonment, physical and sexual abuse,

schizophrenia, brain injury, and resulting poor impulse control satisfied claim for specialized *Penry* mitigation instruction).

**25.** In *Penry*, for example, the defendant had been diagnosed with organic brain damage, possibly caused at birth or by beatings and multiple brain injuries at an early age. Penry offered expert testimony that spoke of the unique character of the severe abuse he suffered, his limited cognitive faculties, and his inability to learn from his mistakes. 492 U.S. at 309–10, 109 S.Ct. 2934.

**26.** *See Barnard*, 958 F.2d at 634 (defendant's childhood experiences did not support *Penry* claim in the absence of evidence that those experiences led to any mental impairment or psychological disability linked to later criminal conduct).

committing this robbery-murder and both his learning disability and troubled background were relevant to whether he would constitute a future danger to society. In *Penry*, the evidence supported an inference that the defendant was unable to learn from his mistakes as a result of his low I.Q., brain impairments, and severe childhood abuse. Thus, he was more likely to be a future danger because of his permanent disabilities. Here, the evidence shows the reverse: despite applicant's limitations and difficulties, his behavior in school was often "exemplary." There is no evidence that applicant was unable to learn from experience or unable to control his conduct, with or without his disabilities.[27] Applicant argues that:

> Evidence of Mr. Smith's troubled family life was simply beyond the scope of the first special issue (deliberateness) to the extent that the jury believed both that Mr. Smith acted deliberately and that his abusive background justified a sentence less than death. The same evidence worked only to his detriment on the second special issue (future dangerousness), because the jury could have concluded that an individual raised in an unstable and abusive environment would learn violence and be more likely to continue being violent as an adult. Thus, the second special issue did not allow the jury to use Mr. Smith's family

life as a mitigating factor. Similarly, the fact that Mr. Smith is a slow learner, with a learning disability and speech handicap, would have no bearing on the first special issue except perhaps to hurt him and, under the circumstances, would only contribute to a "Yes" answer under the special issue.

But this is an argument that could be made about any specific piece of evidence—youth, old age, alcoholism, drug abuse, high intelligence, limited intelligence, poverty, disease, psychological impairments, and so forth. Conclusory assumptions and arguments are not sufficient to make out a *Penry* violation. One must first sort out the *Penry* "double-edged disability" mitigation evidence which cannot be given full effect under the statutory special issues from other, non-*Penry* mitigation evidence which can be given full effect under the special issues.

■ Therefore, we conclude that a defendant first must make a *prima facie* showing of a severe and permanent handicap, not of his own making, which is at least related to the commission of the capital offense.[28] Second, the defendant must show that this disability evidence was effectively beyond the reach of the two special issues. Applicant has made neither showing. We conclude that the two special issues provided applicant's jury with a

---

**27.** *See, e.g., Graham*, 506 U.S. 461, 475–76, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993) (jury could have concluded from evidence of defendant's background that robbery-murder was an aberration and that he would not pose a future danger); *Davis v. Scott*, 51 F.3d 457, 464 (5th Cir.1995) (when defendant's difficult childhood background evidence did not demonstrate that he was unable to learn from his mistakes, but rather that he responded positively to a structured environment, second special issue provided sufficient vehicle for jury's consideration of mitigation evidence). In *Davis*, as in the present case, the evidence showed that the defendant was in special-

education classes and suffered from a learning disability. Nonetheless, the evidence also showed that Davis was a "tender-hearted, a very kind young man ... cooperative ... very creative, very calm, anxious to please." *Id.* at 465. Based upon that evidence, Davis's jury was not "compelled" to answer the second special issue affirmatively; it could give mitigating effect to the evidence presented without any special *Penry* vehicle. *Id.* The same is true in this case.

**28.** *See Robertson*, 325 F.3d at 251.

constitutionally sufficient vehicle to give effect to his mitigating evidence.

## C. The "nullification instruction" in this case was a sufficient vehicle to accord full weight to applicant's mitigation evidence.

██ Applicant also asserts that the extra-statutory mitigation instructions in this case were "virtually identical" to those given in *Penry II*. They are not. Only if the Supreme Court intended to say in *Penry II* that any and all nullification instructions are unconstitutional on their face are these instructions infirm.

In this case, unlike that in *Penry II*, the trial court's special instruction explicitly told the jury that it *"shall* consider any evidence, which, in your opinion, is mitigating."[29] It defined mitigating evidence as "evidence that reduces the defendant's personal or moral culpability or blameworthiness." It expressly informed the jury that "[y]ou may hear evidence which, in your judgment, has no relationship to any of the Special Issues. But if you find such evidence is mitigating under these instructions, you *shall* consider it" and "you *shall*

answer at least one of the Special Issues 'No' " if you believe "that the death penalty should not be imposed due to the mitigating evidence presented to you."[30] Furthermore, the trial court instructed the jury that the State "must prove beyond a reasonable doubt that the death sentence should be imposed despite the mitigating evidence, if any, admitted before you."

Thus, the present instruction not only told the jury that it "shall" consider all mitigating evidence, even evidence unrelated to the special issues, it also told the jury how to answer the special issues to give effect to that mitigation evidence.[31] Here, the jury did not have to read anything into the mitigation instruction or decide which instruction should control over the other one.[32] These instructions expressly authorized and required the jury to answer "No" to at least one of the special issues if it believed that the death penalty was not warranted because of the mitigating circumstances. The trial court's instructions clearly informed the jury that mitigation evidence "trumped" the special issues.[33]

---

**29.** Emphasis added. *Compare supra,* note 15 (instructions in *Penry II*).

**30.** Emphasis added.

**31.** In *Penry II*, the Supreme Court stated that "[a] clearly drafted catchall instruction on mitigating evidence also might have complied with *Penry I."* 532 U.S. at 803, 121 S.Ct. 1910. Justice O'Connor then noted with approval that the Texas Legislature had, at its earliest opportunity, enacted a statutory third special issue which became effective September 1, 1991. That "nullification" special issue trumps the truthful answers to the first two special issues by means of the statutorily authorized third question. At the time of applicant's trial, however, trial courts did not have authority to create and submit this special "nullification" mitigation issue. However, the supplemental instruction given in this case came as close as possible to achieving the same purpose as the third special issue

without the trial judge crossing the boundary of making up new special issues without legislative authorization.

**32.** *Compare Penry II,* 532 U.S. at 797–98, 121 S.Ct. 1910 (one reading of instruction "told jurors to take Penry's mitigating evidence into account in determining their truthful answers to each special issue. Viewed in this light, however, the supplemental instruction placed the jury in no better position than was the jury in *Penry I"*).

**33.** The instruction did not instruct the jury to violate their oaths or answer either of the special issues "falsely," but rather to answer the special issues honestly in light of both the question itself *and* the defendant's mitigating evidence which, as the trial court clearly informed the jury, might or might not have direct relevance to those specific issues. This wording of this specific instruction, unlike

This supplemental instruction, although dissimilar to that in *Penry II*, is similar to that in *Robertson*.[34] We agree with the Fifth Circuit's *en banc* conclusion that this supplemental instruction provided "a more capacious vehicle than was constitutionally warranted."[35] We also agree with that court's determination that:

> the supplemental instruction did not render the jury charge potentially contradictory. The jury was not forced into the position—as they were in *Penry II*—of falsely answering "no" to the questions of deliberateness or future dangerousness. The most that one could say is that the supplemental instruction was redundant in this case.[36]

Therefore, we conclude, as the Fifth Circuit did in *Robertson*, that the supplemental instruction in this case was not error of any sort.[37]

Because we find no constitutional infirmity under either *Penry I* or *Penry II* in this case, we agree with the trial court's recommendation that applicant's request for habeas corpus relief be denied. We therefore deny relief.

HERVEY, J., filed a concurring opinion in which KEASLER, J., joined.

HOLCOMB, J., filed a concurring opinion in which PRICE, J., joined.

HERVEY, J., filed a concurring opinion in which KEASLER, J., joined.

I join Parts II.A. and II.B. of the Court's opinion. We filed and set for submission applicant's post-conviction claim that the special issues and the "nullification" mitigating evidence instruction submitted at the punishment phase of his 1991 capital murder trial did not provide the jury with a vehicle to give effect to mitigating evidence in violation of the Eighth Amendment and the United States Supreme Court's decision in *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (*Penry II*).

## I.

The State suggests that this Court might not have jurisdiction to consider the merits of this claim because it is raised in a successive habeas application. This Court has jurisdiction to consider the mer-

---

that in *Penry II*, did not insert "an element of capriciousness" into the sentencing decision, "making the jurors' power to avoid the death penalty dependent on their willingness to elevate the supplemental instruction over the verdict form instructions." *Compare Penry II*, 532 U.S. at 800, 121 S.Ct. 1910. Instead, the supplemental instructions guided the jurors in answering the special issues by *requiring* them to consider all mitigating evidence of whatever sort and *requiring* them to give effect to that evidence by truthfully answering at least one of the special issues with a "No" if they determined that the State had failed to prove, beyond a reasonable doubt, that a death sentence should be imposed despite the mitigating evidence. *See Penry II*, 532 U.S. at 806–07, 121 S.Ct. 1910 (Thomas, J., joined by Rehnquist, C.J., and Scalia, J. dissenting). We have confidence that jurors are capable of reading and understanding these particular supplemental instructions in a common-sense

manner. This instruction is, in fact, more favorable to the defendant than the third, statutory "nullification" special issue that *Penry II* noted with approval because it explicitly put a burden on the State to prove, beyond a reasonable doubt, that the death penalty should be imposed despite any mitigating evidence. A reasonable jury would not likely be confused by these particular instructions.

**34.** *Robertson*, 325 F.3d at 245 n. 3.

**35.** *Id.* at 258.

**36.** *Id. Compare Bigby v. Cockrell*, 340 F.3d 259, 275–77 (5th Cir.2003) (supplemental instruction that was "almost identical" to that in *Penry II* suffered same constitutional infirmity as in that case).

**37.** *Robertson*, 325 F.3d at 258.

its of this claim. *See* Article 11.071, § 4A(f), TEX.CODE CRIM.PROC.; *Ex parte Smith*, 977 S.W.2d 610, 611 (Tex.Cr.App. 1998).

## II.

In *Penry II*, the Supreme Court decided that the special issues and a "nullification" mitigating evidence instruction submitted at Penry's resentencing hearing failed to provide Penry's jury with an adequate vehicle to give mitigating effect to constitutionally relevant mitigating evidence of Penry's severe childhood abuse and mental retardation that tended to explain Penry's commission of the offense. *See Penry II*, 121 S.Ct. at 1915, 1921–22; *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 2947–49, 106 L.Ed.2d 256 (1989) (*Penry I*). The Court reasoned that: (1) the special issues provided the jury with no vehicle to give mitigating effect to this evidence, and (2) the "nullification" instruction was an "inadequate vehicle" to give mitigating effect to this evidence because it was confusing and it contradicted the special issues making it "logically and ethically impossible for a juror to follow both sets of instructions." *See Penry II*, 121 S.Ct. at 1915, 1921–22; *Penry I*, 109 S.Ct. at 2947, 2949. The "less than artful" portion of the "nullification" instruction which the Supreme Court found objectionable stated:

> If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of

the defendant, a negative finding should be given to one of the special issues. *Penry II*, 121 S.Ct. at 1921.

## III.

In this case, applicant was convicted of murdering a former female coworker during a robbery of a Taco Bell restaurant. Applicant tortured the terrified young victim before brutally killing her. Consistent with the evidence presented at applicant's 1991 trial, the prosecution provided the following summary of its theory of the case to the jury at applicant's 1991 trial.

> ... [Applicant] goes on back to where [the victim] is in that back office, and you heard from the witnesses about how they saw him pistol whipping her about her head. "What's the combination, Jennifer, to open the safe?" "I can't. I don't know it. I don't know it. I can't open the safe. I can't. I don't know it." You know that he proceeded to pistol whip her about the head. You know after that that he shot her in the back, right back here behind the left shoulder bone, came out right underneath her left breast, and what did she say? "God, please don't let me die." But that wasn't enough.
>
> Is there any question about whether or not his conduct was deliberate? It wasn't enough to pistol whip her, and it wasn't enough to shoot her in the back with that gun. So, what is the next thing that he does? "Well, she's not dead yet, you see. She's still alive. She still might give me the combination to the safe," or open it up for him. So, what does he do? He goes back into the kitchen area, grabs a butcher knife—and you saw that knife—and he comes back in there, and I submit to you, and you heard from the testimony of Dr. Davis, the medical examiner—what did he tell you? Let's talk about how he went about killing her. Let's talk about it.

He said the cause of death was multiple stab wounds and the gunshot wound to the back. He told you, and I submit to you—he told you he can't tell you the order that those wounds occurred, but I submit to you that it went something like this: Pistol whipped her, she still wouldn't comply, then he shot her in the back. She still is saying, "I don't know the combination of the safe." He gets the butcher knife. He comes back—and Dr. Davis told you about those little cluster wounds. "Tell me the combination, Jennifer." "I don't know it." Nick, nick, nick, nick, right underneath her left breast. "Give me the combination, Jennifer." "I can't." Then I submit to you that he proceeded to stab her in the thigh and in the abdomen and in the head, and you know about that fatal wound, that gaping slash, on the side of her neck.

Applicant also presented what he claimed was mitigating evidence at his 1991 trial. Applicant's writ (with citations to the 1991 trial record omitted) sets out the following evidence which applicant claims was mitigating.

During trial, Applicant presented mitigating evidence. Applicant showed Sandier exaggerated the extent of his injuries incurred during the bat incident [in which applicant assaulted Sandier with a baseball bat]. Applicant showed he was docile when confronted and arrested by the police. Although Applicant's teachers and principals found Applicant was disruptive and disrespectful, Applicant never got into any trouble so serious that required the intervention of the Youth Division of the Dallas Police Department at Carter High School.

Similarly, Applicant never found himself in the sort of trouble that required the intervention of the Youth Action Center, which was precisely where Applicant would have gone if he had been involved in anything that was beyond the scope of the teachers and principals to handle effectively. Applicant's pastor thought highly of him but acknowledged, realistically, that some of Applicant's problems could be attributed to the fact he was a teenager and to the fact Applicant's father had seriously destabilized Applicant's family. Applicant showed he was medically diagnosed as a slow learner. Applicant showed he was learning disabled and speech handicapped. Applicant had an IQ of 78. Applicant showed that, notwithstanding the fact he was failing in special education, he was promoted. Applicant showed he was not a disruptive force when in a prison environment. Applicant showed that his friends, family, and neighbors liked and respected him for his loyalty, thoughtfulness, generosity, and willingness to assume responsibility. The offense for which Applicant was convicted is inconsistent with his history. Additionally, the violence and brutality of the offense are inconsistent with Applicant's past behavior.[1]

The record from the punishment phase of applicant's 1991 trial reflects that the "deliberateness" and "future dangerousness" special issues were submitted to the jury along with a "nullification" mitigating evidence instruction which allowed the jury to give effect to applicant's mitigating evidence "beyond the scope of the special issues" by authorizing a "no" answer to

---

1. The 1991 trial record further indicates that applicant presented evidence that applicant's father was a drug addict and neglected applicant. The father also stole from the family to support his drug habit and this upset applicant. The father eventually left applicant's home.

one of the special issues. This instruction provided:

You are instructed that you shall consider any evidence which, in your opinion, is mitigating. Mitigating evidence is evidence that reduces the Defendant's personal or moral culpability, or blameworthiness, and may include, but is not limited to, any aspect of the Defendant's character, record, background, or circumstances of the offense for which you have found him guilty. Our law does not specify what may or may not be considered as mitigating evidence. Neither does our law provide a formula for determining how much weight, if any, a mitigating circumstance deserves. You may hear evidence which, in your judgment, has no relationship to any of the Special Issues, but if you find such evidence is mitigating under these instructions, you shall consider it in the following instructions of the Court. You, and each of you, are the sole judges of what evidence, if any, is mitigating and how much weight, if any, the mitigating circumstances, if any, including those which have no relationship to any of the Special Issues, deserves.

In answering the special issues submitted to you herein, if you believe that the State has proved beyond a reasonable doubt that the answers to the special issues are "Yes," and you also believe from the mitigating evidence, if any, that the defendant should not be sentenced to death, then you shall answer at least one of the special issues "No" in order to give effect to your belief that the death penalty should not be imposed due to the mitigating evidence presented to you. In this regard, you are further instructed that the State of Texas must prove beyond a reasonable doubt that the death sentence should be imposed despite mitigating evidence, if any, admitted before you.

The 1991 trial record further reflects that, during voir dire, this instruction and how it operated was very carefully explained to each veniremember who sat on appellant's jury and that these veniremembers stated that they understood it. For example, Juror # 7 stated:

Q. [PROSECUTION]: I want to throw another wrinkle in on these [special issues]. Assuming that you hear evidence that convinces you [the special issues] should be answered yes, okay, the law is going to give you—the Court would give you a further instruction, and it has to do with what's called mitigating evidence. Mitigating evidence has— means, basically, some type of evidence that would lessen a person's responsibility for his action, okay? For example, let's say that they are retarded or they have a drug or alcohol problem or they have been abused as a child.

Those factors might be considered by a juror to be mitigating. They might decide, "Well, you know, because of what I've heard, I know the guy did the crime, and I know these questions technically are answered yes, you know, he did it deliberately and there's a future threat, but because was what I've heard, this mitigating evidence, I don't feel the person should die for what he did. In my heart, I don't think he should die because of these factors."

The judge is going to tell you if that's the case, you can go back and change one of these answers to no to give effect to that feeling. The reason for that is there's nothing in these questions that you can really factor that in. There's nothing in there to say anything about his mental state or whether or not he had a problem growing up.

Now, if that evidence is raised, you're going to have that consideration—that

option to change one of these answers. And, you know, what's mitigating to one juror may not be to another. You all are going to have to decide, if you hear it, if you think that's enough to prevent the death sentence. One juror—you may hear that the guy was on drugs when he committed the offense. If you hear something like that, you can see how one juror might say, "Well, I can see how that kind of excuses, kind of, maybe. If he hadn't been doing drugs, he wouldn't have done this, and because of that, I don't think he needs to die." Juror, you know, number two might look at you and say, "Well, I think that's even worse. He shouldn't have even done the drugs to start with. That makes it even worse that he's doing drugs and killing people."

The point I'm getting at is that you know what's mitigating, you all are going to have to decide that, and what's mitigating to one person may not be to another. That phrase, that's about as big a definition as you're going to get about that. You'll have to decide that. So if you hear that type of evidence, you're going to be faced with a couple of questions. One is, first of all, is it mitigating? And secondly, is it mitigating to the point where you don't believe the death sentence should be assessed? If that's the case, you're going to have an option to change an answer.

Do you feel that you could do that if you heard the proper facts?

A. [JUROR # 7]: Uh-huh.

. . .

Q. [DEFENSE]: [Juror # 7, the prosecutor] has talked to you, also, and told you that this scheme of special issues is kind of skewed because a jury can still believe that an act was done deliberately and that he could be a future threat to

society but still believe that he should die. It could be his role in the murder. It could be just a fairness issue in terms of other people involved, what has happened to them.

It could be any number of things, but a juror could, in essence, just say, "I don't think he should die." Then if all you have are those two questions, and if you honestly believe the answers were yes, then the person would be killed even though the jury still felt he should live. And the legislature hasn't quite caught up to the law. The Supreme Court has recognized that, and, ideally, there should probably be a fourth special issue saying regardless of answers one through three, do you feel there is mitigating evidence such that it should save his life or some phrase like that.

I probably wouldn't be a very good legislator since I can't draft it, but that's not the way the law is now. That's not the way the statute is, but the judge would give you in the court's charge an instruction that says if you find there is mitigating evidence, and if you believe that that should save him from the death penalty, then you shall—shall is the big legal word for must—shall change one of the answers to no so that you can give effect to your heartfelt beliefs.

In other words, if there's two yes answers, the judge has to sentence him to death. If there is one no, he gets a life sentence. Those are the only two options. And so the law has said that the only way the judge could give effect to the jury's true belief is if one answer was no.

Do you feel that if you heard mitigating evidence and if you felt that regardless of whether he would be a threat in the future and regardless of whether you felt the act was done deliberately, if you felt that he should not die, could you go

back and, in essence, erase one of the yeses and put no in order to give effect and meaning to your true feelings?

A. [JUROR # 7]: Yes.

Q. [DEFENSE]: I mean, that's what the Court would tell you all to do, that you're allowed to do, and if you felt he should live, then the Court says you shall change one of the answers. In other words, you're not cheating or not giving a true verdict, you're following the Court's law or the Court's rules.[2] Do you have any problem with that, ma'am?

A. [JUROR # 7]: Huh-uh.

Q. [DEFENSE]: Do you understand why that particular charge would be in there?

A. [JUROR # 7]: Yes.

Juror # 10 similarly stated.

Q. [DEFENSE]:—and if it didn't make sense, you could discard it? Okay. The law—kind of getting back to those two questions, it used to be that there were no questions and the jury has—like I was kind of saying or trying to say earlier, they had a wide discretion on what to do. That before these special issues came into being, juries would just decide whether it should be life or death, 15 years probation, whatever. Because of the way they're structured, two "yes" answers equals death, and there's no secret. We're not, you know, trying to hide the law or anything. It's all up front. It's come to the court's attention, primarily, because the legislature is a little bit behind the court's decisions that this format may not be entirely fair because jurors could believe that the person—there's a probability that they would be a continuing threat to society, but still believe that the person

shouldn't die. In other words, through the whole ball of wax, through the trial and the guilt-innocence and punishment phase, they could just believe that under this fact situation with this person, he should die, and by just answering mechanically "yes" and "yes," if that's a true answer, you could never save the person. Like the prosecutor was telling you, the court will indicate that if you believe through what's called mitigating evidence—that's really anything. It's stuff you could hear in the guilt-innocence phase; it's stuff that you could hear in the punishment phase; it's the whole totality of circumstances—if you felt that he shouldn't die, then you're authorized—actually the court says you shall, which is legal mumbo-jumbo for must, change one of the answers from "yes" to "no" if you feel that he should not die.

Do you have any problem with that?

A. [JUROR # 10]: No.

Q. [DEFENSE]: Okay. I mean, it's not like you're cheating or lying or doing something—

A. [JUROR # 10]: No.

Q.[DEFENSE]:—to change it. That's what the Court would tell you to do to give effect to your heartfelt belief that he should live, okay? Also these two special issues are kind of designed to be high hurdles. In other words, the law is trying to decide of all the people that commit capital murders, murders in the course of robbery, why should some live and some die. They're trying, I think, to remove the—they called it, I think, arbitrary and freakish dispositions or impositions of the death sentence or capriciously done, something like that, that there's no rhyme or reason to it. I

---

2. *But see Penry II,* 121 S.Ct. at 1922 (claiming that this could have caused conscientious jurors to violate their oaths in answering the special issues).

think what the legislature is trying to do is set certain barriers or hurdles for the State to get over before a person should be killed, and they're supposed to be high hurdles. In other words, the standard is beyond a reasonable doubt. They're looking for a deliberate act. They're looking for future dangerousness. On top of all that, they're looking for no mitigation to change the answers. Do you have any problem with the way those special issues are designed and how you could answer them if you felt he should live instead of die?

A. [JUROR # 10]: No.[3]

During closing jury arguments at the punishment phase, applicant reminded the jury of the procedure that was carefully explained to them during voir dire.

> I want to talk to you about mitigating evidence. Mitigating evidence is that evidence that reduces the defendant's personal or moral culpability and may include, but is not limited to, any aspect of his character, record, background, or circumstances of the offense. It may go to one of the special issues, it may not, but the Court tells you that the State has a burden—that if you think that he should not die, you are to put "no" in one of the spaces, that the State has the burden of proof beyond a reasonable doubt to convince each and everyone of you that he should still die.[4]

## IV.

I would decide that applicant procedurally defaulted the claim that he makes for the first time in this habeas proceeding. It must be kept in mind that *Penry I* had been decided at the time of applicant's 1991 trial and that *Penry II* did not break new ground or announce any new rules because it decided only that the jury instructions at Penry's retrial did not comply with *Penry I's* mandate. *See Penry II*, 121 S.Ct. at 1915, 1924; *Robertson v. Cockrell*, 325 F.3d 243, 255–57 (5th Cir.), cert. denied, —— U.S. ——, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003) (*Penry II* only reiterated the holding of *Penry I*).

The record reflects that applicant did not object to the "nullification" instruction at his 1991 trial. *Compare Penry II*, 121 S.Ct. at 1923 (stating that Penry offered definitions to the charge that the trial court refused to give). On the contrary, a review of the 1991 trial record (particularly the individual voir dire) indicates that applicant was satisfied with the "nullification" instruction. Almost 13 years later but before the Supreme Court decided *Penry II*, applicant filed this habeas application in which he claimed for the first time that the conflicting instructions in the charge precluded the jury from giving effect to mitigating evidence. Echoing the Supreme Court's later decision in *Penry II*, applicant argued in support of this claim that it "confounds common sense to suggest jurors—who are sworn to tell the truth—would ever understand that they were authorized to answer [the special issues] falsely, and yet this is precisely what the 'nullification' instruction invited the jury to do."

---

**3.** The Supreme Court discounted similar voir dire proceedings in *Penry II* by explaining that the jurors (at least those in that case) "surely" had "a distant and convoluted memory" of those voir dire proceedings by the time they began their punishment phase deliberations. *See Penry II*, 121 S.Ct. at 1922–23.

**4.** The Supreme Court discounted a similar argument made by the defense in *Penry II* by explaining that this "only reminded the jurors that they had to answer the special issues *dis* honestly in order to give effect to Penry's mitigating evidence." *See Penry II*, 121 S.Ct. at 1923 (emphasis in original).

Applicant presents no reason why he could not have raised this claim at his 1991 trial. Applicant also presents no reason why he could not have raised this claim on direct appeal. On direct appeal, applicant claimed only that we should have reconsidered our post-*Penry I* precedents because they had "unconstitutionally narrowed the sentencer's discretion to consider relevant mitigating evidence." Applicant, of course, did not raise this claim at his 1991 trial.

One might suggest that applicant could not have raised the claim that he raised in his habeas application before the Supreme Court decided *Penry II*. But, applicant did raise this claim in his habeas application before the Supreme Court decided *Penry II*. There is no reason why he could not have raised it 13 years ago. Applicant, therefore, procedurally defaulted the claim that he raises for the first time in this habeas corpus proceeding.

### V.

Notwithstanding the foregoing, the claim that applicant raises for the first time in this habeas corpus proceeding lacks substantive merit. In addressing applicant's claim that his jury had no vehicle to give effect to his mitigating evidence, it is helpful to briefly summarize our *post-Penry I* mitigating evidence jurisprudence. The Supreme Court in *Jurek* and several other cases has upheld the constitutionality of Texas' special issues framework because these special issues generally provide a jury with a vehicle to meaningfully give effect to relevant mitigating evidence. *See, e.g., Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976); *Graham v. Collins*, 506 U.S. 461, 113 S.Ct. 892, 901, 122 L.Ed.2d 260 (1993). In *Penry I*, the Supreme Court decided only that

this framework was unconstitutionally applied to Penry because it did not provide the jury with a vehicle to give mitigating effect to Penry's evidence of mental retardation and severe childhood abuse that tended to explain his commission of the offense. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 2947–49, 106 L.Ed.2d 256 (1989). We were assured, however, that *Penry I* did not "effec[t] a sea change in [the Supreme Court's] view of the constitutionality of the former Texas death penalty statute." *See Graham*, 113 S.Ct. at 901.

Some members of this Court believed that *Penry I* required in every case another jury instruction to provide a jury with a vehicle to give effect to any mitigating evidence "beyond the scope of the special issues." Realizing that this view would have effected a "sea change" in the constitutionality of the "former Texas death penalty statute," this Court's post-*Penry I* precedents narrowly read *Penry I* and decided in numerous cases that the special issues provided a jury with a vehicle to meaningfully give effect to mitigating evidence such as that presented in this case.[5]

This Court's post-*Penry I* precedents also decided that a defendant had to establish a "nexus" between his claimed mitigating evidence and the offense (that tended to excuse the defendant's commission of the offense) before the defendant was entitled to another jury instruction to give effect to this evidence beyond the scope of the special issues. *See* Footnote 6. This "nexus" requirement was based on *Penry I's* definition of constitutionally relevant mitigating evidence. *See Penry I*, 109 S.Ct. at 2947; *Richardson v. State*, 901 S.W.2d 941, 942 (Tex.Cr.App.1994); *Lackey*, 819 S.W.2d at 134–35.[6]

---

5. *See Lackey v. State*, 819 S.W.2d 111, 128–36 (Tex.Cr.App.1989); *Mines v. State*, 888

S.W.2d 816, 818–21 (Tex.Cr.App.1994) (Baird, J., concurring) and cases cited.

6. In *Richardson,* we noted that *Penry I* states

Some claimed that this was a "crabbed interpretation" of *Penry I*.[7] As it turned out, the Supreme Court upheld this "crabbed interpretation" of *Penry I* in *Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) which decided that the Constitution does not require that "a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant" and that *Penry I* is satisfied as long as relevant mitigating evidence is within "the effective reach of the sentencer." *See Johnson*, 113 S.Ct. at 2669.[8] When relevant mitigating evidence is within "the effective reach of the sentencer," no separate jury instruction is required to provide a jury with a vehicle to give effect to this evidence beyond the scope of the special issues even if there is a "nexus" between this evidence and the offense. *See Johnson*, 113 S.Ct. at 2669; *Richardson*, 901 S.W.2d at 941–42; *Richardson*, 886 S.W.2d at 771–76. A separate jury instruction is required **only** when the special issues place constitutionally relevant mitigating evidence completely beyond "the effective reach of the sentencer." *See Johnson*, 113 S.Ct. at 2669; *see also Penry II*, 121 S.Ct. at 1922 (reasonable likelihood that "nullifi-

cation" instruction prevented jury from considering constitutionally relevant mitigating evidence); *Penry I*, 109 S.Ct. at 2949 (reasonable likelihood that the special issues prevented the jury from considering constitutionally relevant mitigating evidence).

Our post-*Penry* I precedents are also consistent with the Fifth Circuit's post-*Penry I* jurisprudence. *See Robertson*, 325 F.3d at 248–55. The Fifth Circuit has also concluded that *Penry II* did not disturb this post-*Penry I* jurisprudence. *See Robertson*, 325 F.3d at 255–57 (rejecting any suggestion that *Penry II* silently modified *Penry I* and encroached upon *Jurek*). With these comments in Section V. of this opinion, I join parts II.A. and II.B. of the Court's opinion.

## VI.

With all of this in mind, it is clear that applicant's jury could have meaningfully given mitigating effect to any relevant mitigating evidence in answering the special issues. This Court would also have to ignore a significant number of its precedents as well as Fifth Circuit case law to

---

that a defendant presents relevant mitigating evidence when he presents evidence that his criminal acts "are attributable to a disadvantaged background, or to emotional and mental problems." *See Richardson*, 901 S.W.2d at 942; *Lackey*, 819 S.W.2d at 134–35. *Penry I*, 109 S.Ct. at 2947 (internal quotes omitted), literally states:

> If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

7. *See Richardson v. State*, 886 S.W.2d 769, 777–79 (Tex.Cr.App.1991) (Clinton, J., dissenting) (claiming that "essence of the Supreme Court's holding" in *Penry I* required that a "jury must be empowered to give mitigating evidence all the effect to which it is susceptible"); *see also Richardson*, 901 S.W.2d at 941–42 and at 942–43 (Clinton, J., dissenting).

8. We note that *Penry II* cites to a dissenting opinion in *Johnson* followed by a parenthetical stating that a "sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances." *See Penry II*, 121 S.Ct. at 1920 citing *Johnson*, 113 S.Ct. at 2676 (O'Connor, dissenting) (emphasis in original). I do not understand this part of *Penry II* as having silently overruled *Johnson*.

hold otherwise.[9] The "nullification" mitigating evidence instruction at applicant's 1991 trial, therefore, provided applicant more than what he was constitutionally entitled to receive. *See Johnson*, 113 S.Ct. at 2669; *Robertson*, 325 F.3d at 257–58 ("nullification" instruction provided the defendant "with a more capacious vehicle than was constitutionally warranted").

It has been suggested that applicant's "criminal conduct was in some way attributable to his unfortunate childhood experiences" which would have entitled him to a charge that provided the jury with a vehicle to give effect to this evidence beyond the scope of the special issues. Applicant was not entitled to such a charge because "there is ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination." *See Johnson*, 113 S.Ct. at 2669; *Lackey*, 819 S.W.2d at 134 (evidence of defendant's "limited intellectual and mental capability, his problematic relationship with his father, physical abuse by his father, and his age at the time of the offense is relevant to a proper resolution of the concerns" of the future dangerousness special issue); *Robertson*, 325 F.3d at 253 (statutory special issues were adequate to allow jury to effectuate the mitigating potential of defendant's claim of childhood abuse because this evidence exhibited no "nexus to his brutal crimes").

Applicant's evidence of "unfortunate childhood experiences," like the evidence of the "ill effects of youth" in *Johnson*, could have been "readily comprehended as a mitigating factor in consideration of the [future dangerousness] special issue." *See Johnson*, 113 S.Ct. at 2669–70. In *Johnson*, 113 S.Ct. at 2669–70, the Court stated:

That the jury had a meaningful basis to consider the relevant mitigating qualities of petitioner's youth is what distinguishes this case from [*Penry I*]. In [*Penry I*], there was expert medical testimony that the defendant was mentally retarded and that this condition prevented him from learning from experience. (Citation omitted). Although the evidence of the mental illness fell short of providing Penry a defense to prosecution for his crimes, the Court held that the second special issue did not allow the jury to give mitigating effect to this evidence. Penry's condition left him unable to learn from his mistakes, and the Court reasoned that the only logical manner in which the evidence of his mental retardation could be considered within the future dangerousness inquiry was as an aggravating factor. (Citation omitted). [*Penry I*] remains the law and must be given a fair reading. The evidence of petitioner's youth, however, falls outside [*Penry I's*] ambit. Unlike Penry's mental retardation, which ren-

---

**9.** *See, e.g., Mines*, 888 S.W.2d at 818–21 (Baird, J., concurring) and cases cited (evidence of brain damage, violent family background, growing up in poverty, voluntary intoxication, drug abuse, suicide attempt, lack of education, being a good and loving child, critical illness as a child, voluntary service, good character evidence, abusive childhood, remorse, general good character evidence, mental instability can be given mitigating effect when answering the special issues); *Lackey*, 819 S.W.2d at 128, 134 (evidence of "a low level of intelligence, shown by ex-tremely substandard IQ test scores," poor school record, turbulent childhood and troubled relationship with father, and youth could be given mitigating effect when answering the special issues); *Robertson*, 325 F.3d at 249–51 (additional instructional vehicles not required for many different types of mitigating evidence, including but not limited to, subnormal intelligence, youth, troubled or abused childhood, intoxication, substance abuse, head injury, good character, mental illness, antisocial personality disorders, and dyslexia).

dered him unable to learn from his mistakes, the ill effects of youth that a defendant may experience are subject to change and, as a result, are readily comprehended as a mitigating factor in consideration of the second special issue.

Petitioner does not contest that the evidence of youth could be given some effect under the second special issue. Instead, petitioner argues that the forward-looking perspective of the future dangerousness inquiry did not allow the jury to take account of how petitioner's youth bore upon his personal culpability for the murder he committed. According to petitioner, "[a] prediction of future behavior is not the same thing as an assessment of moral culpability for a crime already committed." (Citation omitted). Contrary to petitioner's suggestion, however, this forward-looking inquiry is not independent of an assessment of personal culpability. It is both logical and fair for the jury to make its determination of a defendant's future dangerousness by asking the extent to which youth influenced the defendant's conduct. (Citation omitted). If any jurors believed that the transient qualities of petitioner's youth made him less culpable for the murder, there is no reasonable likelihood that those jurors would have deemed themselves foreclosed from considering that in evaluating petitioner's future dangerousness. It is true that Texas has structured consideration of the relevant qualities of petitioner's youth, but in so doing, the State still "allow[s] the jury to give effect to [this] mitigating evidence in making the sentencing decision." (Citation omitted). Although Texas might have provided other vehicles for consideration of petitioner's youth, no additional instruction beyond that given was required in order for the jury to be able to consider the mitigating qualities of youth presented to it.

### VII.

It is unnecessary for the Court to state in Part II.C. of its opinion that, as a matter of federal constitutional law, the "nullification" instruction here was a sufficient vehicle to accord "full" weight to applicant's mitigation evidence. The Constitution does not require a vehicle to accord "full" weight to a defendant's mitigation evidence. *See Johnson,* 113 S.Ct. at 2669 (Constitution does not require that "a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant"). In addition, the "nullification" instruction would, as a matter of federal constitutional law, suffer from the same defect as the one in *Penry II* had applicant presented any mitigating evidence that was beyond "the effective reach of the sentencer." *See Penry II,* 121 S.Ct. at 1915, 1921–22; *Johnson,* 113 S.Ct. at 2669. It is dispositive of applicant's federal constitutional claim in this case to simply decide that the special issues submitted at applicant's 1991 trial provided the jury with a vehicle to give constitutionally sufficient mitigating effect to applicant's mitigating evidence and that this evidence was within "the effective reach of the sentencer." *See id.*

### VIII.

Finally, having decided that no federal constitutional violation occurred in this case, we may disagree with the United States Supreme Court that Texas jurors are incapable of remembering, understanding and giving effect to the straightforward and manageable "nullification" instruction such as the one in this case. *But see Penry II,* 121 S.Ct. at 1922–23. The record in this case clearly reflects that there was no reasonable likelihood that the

jury applied the "nullification" instruction in a way that prevented it from considering and giving effect to constitutionally relevant mitigating evidence even beyond the scope of the special issues. *Cf. Penry II*, 121 S.Ct. at 1922 (federal constitutional issue is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that prevented the consideration of constitutionally relevant mitigating evidence). Even though it may not have done so as a matter of federal constitutional law, the "nullification" instruction did, as a matter of fact, provide the jury with a vehicle to accord "full" weight to applicant's mitigation evidence.

I concur in the Court's judgment to deny habeas corpus relief.

HOLCOMB, J., filed a concurring opinion in which PRICE, J., joined.

## OPINION

I agree with the majority that the petitioner is not entitled to relief on habeas corpus. However, I do so only because I am compelled by the facts to agree with the concurrence that Smith procedurally defaulted the claim he now raises, that his nullification instruction was insufficient under *Penry II*,[1] precluding the jury from giving effect to his mitigating evidence. Smith did not object to the nullification instruction during his trial in 1991. An objection at that time would not have been futile because this Court had not yet addressed the issue. We addressed the issue in 1992 when we decided *Fuller*[2] and held that a nullification instruction was sufficient under *Penry I*. Thus, I concur with the result. However, I am concerned regarding the application of procedural default in cases in which the consequences

are so dire and where the claim raised is meritorious.

I write to dissent to the majority's reasoning and resolution of Smith's claim on the merits. Under *Penry I*, a defendant is entitled to a supplemental instruction if there is mitigating evidence that is (1) relevant to the defendant's moral culpability for the offense and (2) beyond the scope of the special issues. The evidence Smith produced satisfied these two requirements. Therefore, he was entitled to a supplemental instruction to provide the jury with a vehicle to consider and give effect to that evidence. The nullification instruction provided to Smith's jury contained the same defects the Supreme Court identified in *Penry II*. Therefore, the jury was unconstitutionally precluded from considering and giving effect to Smith's mitigating evidence.

The majority errs in choosing to adopt what is essentially the Fifth Circuit's *Penry I construct* limiting the application of *Penry I's* holding to cases in which the evidence demonstrate a uniquely severe permanent handicap. The majority also errs in finding Smith's nullification instruction to be sufficiently distinguishable from Penry's that Smith's nullification instruction would provide a sufficient vehicle under *Penry I*. Therefore, I dissent.

*Penry I's* Supplemental instruction requirement

In general, the Court in *Penry I* recognized that when a defendant presents mitigating evidence relevant to his personal moral culpability but not relevant to the special issues or relevant to the special issues only as an aggravating factor, the special issues alone would not allow the jury to give effect to the mitigating quality

---

1. *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (*Penry II*).

2. *Fuller v. State,* 829 S.W.2d 191, 209 (Tex. Crim.App.1992).

the evidence presented.[3] In that situation, the State must provide an additional vehicle to the jury so that the jury may consider and give effect to the evidence. Therefore, the defendant's mitigating evidence necessitates a *Penry I* instruction when: (1) the evidence is relevant to the defendant's moral culpability, and (2) the mitigating quality of such evidence cannot be given effect under the special issues alone.

Regarding the first requirement, with respect to *Penry I* claims, this Court has focused on whether the evidence demonstrated a nexus between the mitigating circumstance and the offense.[4] This nexus requirement is rooted in the following statement from Justice O'Connor's concurring opinion in *California v. Brown*[5] that was adopted by the majority of the Supreme Court in *Penry I:*[6]

> If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may

be less culpable than defendants who have no such excuse.[7]

This statement followed the Court's summary of its holding in *Eddings*[8] that "a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death."[9] Thus, the Supreme Court established the nexus requirement as the way to determine when evidence that might be considered mitigating is relevant to the defendant's moral culpability, and, thus also to whether the death penalty is appropriate for the defendant. While the Supreme Court has not used the term "nexus," this label encapsulates the Supreme Court's reasoning.

This Court has not previously interpreted *Penry I* to require the mitigating circumstance about which evidence is presented to be unique, severe, permanent, or a handicap. We have found that certain evidence "fails to rise to the level of *Penry* evidence,"[10] or is "not the same quality and character as Penry's."[11] These statements, however, were made in the context of determining whether a nexus existed between the mitigating circumstance and

---

3. *See Penry I,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256.

4. *Goss v. State,* 826 S.W.2d 162 (Tex.Crim. App.1992). *See also Zimmerman v. State,* 881 S.W.2d 360 (Tex.Crim.App.1994); *Earhart v. State,* 877 S.W.2d 759 (Tex.Crim.App.1994); *Mines v. State,* 888 S.W.2d 816 (Tex.Crim. App.1994); *Satterwhite v. State,* 858 S.W.2d 412 (Tex.Crim.App.1993); *Muniz v. State,* 851 S.W.2d 238 (Tex.Crim.App.1993); *Richardson v. State,* 879 S.W.2d 874 (Tex.Crim.App.1993); *Richard v. State,* 842 S.W.2d 279 (Tex.Crim. App.1992); *Nobles v. State,* 843 S.W.2d 503 (Tex.Crim.App.1992); *Lackey v. State,* 819 S.W.2d 111 (Tex.Crim.App.1989), *opinion on motion for rehearing,* 816 S.W.2d 392 n. 10 (Tex.Crim.App.1991); *Gribble v. State,* 808 S.W.2d 65 (Tex.Crim.App.1990) (plurality opinion) (suggested requirement).

5. *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).

6. *See Lackey,* 819 S.W.2d at 135 n. 10.

7. *Penry I,* 492 U.S. at 319, 109 S.Ct. 2934.

8. *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

9. *Penry I,* 492 U.S. at 318, 109 S.Ct. 2934.

10. *Cantu v. State,* 842 S.W.2d 667, 693 (Tex. Crim.App.1992); *Earhart v. State,* 823 S.W.2d 607, 632 (Tex.Crim.App.1991).

11. *Goss v. State* 826 S.W.2d 162, 166 (Tex. Crim.App.1992).

the defendant's moral culpability, thereby allowing the jury to find the defendant less culpable by contemporary moral values.[12]

In *Mines*,[13] we considered the permanence of the mitigating circumstance to be relevant to a determination of whether the evidence necessitated a *Penry I* instruction. However, we considered it relevant to the issue of whether the jury could give mitigating effect to the evidence within the special issues and not to whether the evidence demonstrated a nexus between the mitigating circumstance and the defendant's moral culpability for the crime.[14]

Regarding the second requirement, the Court in *Penry I* not only found that the evidence regarding mental retardation was relevant to the question of deliberateness, but also determined that the evidence had mitigating relevance beyond the scope of the special issue.[15] The Court held that without an instruction defining "deliberately" to mean that the jury must consider mitigating evidence fully as it bears on personal culpability, the Court could not be sure that the jury was able to give effect to the mitigating evidence through the deliberateness question.[16] The Court determined that the evidence was also relevant to the future dangerousness question, but only as an aggravating factor, placing the mitigating relevance beyond the scope of the special issues.[17] The Court cited the concurrence from *Franklin*[18] stating that an Eighth Amendment analysis is required if mitigating evidence is introduced that is not relevant or that has relevance beyond the scope of the special issues.[19]

Although our *Penry I* decisions may be consistent with those of the Fifth Circuit, the Fifth Circuit's decisions are not necessarily consistent with our precedent. In addition to the nexus and scope requirements we have applied to *Penry I* cases, the Fifth Circuit has imposed an independent, multi-faceted requirement that the evidence must demonstrate that the mitigating circumstance constitutes a uniquely severe permanent handicap. Though we have interpreted *Penry I* narrowly, I do not believe we have, nor do I believe it should be, interpreted as narrowly as the Fifth Circuit has done. The majority and concurrence appear to ignore our precedent in favor of the Fifth Circuit's *Penry I* test. I think this is a grave injustice. While the factors involved in the Fifth Circuit's independent requirement may be helpful to consider in determining whether a defendant's evidence meets the nexus and scope requirements, as they were in *Penry I*, they should not be determining factors. Such an interpretation undermines the reasoning in *Penry I*, because a defendant whose mitigating evidence meets the nexus and scope requirements may still be deprived of a supplemental instruction so that the jury is precluded from considering and giving effect to evidence relevant to the defendant's moral culpability for the offense.

Our precedent, without adopting the Fifth Circuit's additional independent requirement, does not suggest that all nullification instructions are constitutionally infirm in all cases in which the defendant

**12.** *Richardson v. State,* 879 S.W.2d 874, 885 (Tex.Crim.App.1993).

**13.** *Mines v. State,* 888 S.W.2d 816, 817–818 (Tex.Crim.App.1994).

**14.** *Id.*

**15.** *Penry I,* 492 U.S. at 322, 109 S.Ct. 2934.

**16.** *Penry I,* 492 U.S. at 322, 109 S.Ct. 2934.

**17.** *Penry I,* 492 U.S. at 323, 109 S.Ct. 2934.

**18.** *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).

**19.** *Penry I,* 492 U.S. at 321, 109 S.Ct. 2934.

offers any mitigation evidence. The mitigating evidence must meet the nexus and scope requirements. Good character evidence would not usually meet the nexus requirement, whereas evidence of the defendant's age would not usually meet the scope requirement. These two requirements, without more, have been effective at limiting the application of *Penry I* to cases to which the Supreme Court's reasoning in *Penry I* applies.

For example, in *Richardson*, we found that Richardson made no evidentiary showing that either his alleged childhood experiences of poverty, parental neglect, illiteracy, and possessing a speech disorder, or the alleged fact that his mother taught him to shoplift, tended to excuse his capital crime. We stated that our conclusion might be different if Richardson had presented evidence that his mother had taught him to kill or commit other crimes of violence, or if his capital crime had begun as a robbery. Evidence of this nature might, from the viewpoint of society, tend to excuse the defendant's criminal behavior because the crime was caused in part by a personality that was damaged through no fault of his own.[20]

**Applying *Penry I* to Smith's evidence**

Unlike in *Richardson*, in this instance, the offense began as a robbery, and Smith's father had, if not taught his son to steal, modeled such behavior to the extent that Smith copied his father's behavior both at home and at school by taking things that did not belong to him. In addition to stealing, his father demonstrated on at least one occasion that it was acceptable behavior to threaten someone with bodily harm in an attempt to obtain another's property. Although the record does not reflect precisely when certain events occurred in his household, Smith was nineteen years old at the time of the offense, so there was not a substantial length of time separating his childhood experiences from his criminal behavior. In fact, he was still living with his mother. In short, the record contains evidence from which a rational jury could conclude that Smith's criminal conduct was in some way attributable to his unfortunate childhood experiences.[21] The jury, applying contemporary moral standards, could rationally have found Smith less morally culpable for his behavior than if he had not had such childhood experiences. I would therefore find Smith's evidence provided a sufficient nexus.

Under the first special issue, evidence of Smith's troubled childhood, if relevant at all without an additional definition of deliberately defined in terms of moral responsibility, would only be aggravating. The evidence may indicate that Smith acted deliberately, although perhaps unaware of the influence that his background had on his deliberations, in deciding to participate in the robbery and murder. Under the second special issue, the evidence, again, could only be aggravating. The evidence would indicate that Smith's unhappy background did in fact pervade his personality to such an extent that it continued to affect his behavior and choices, which the record reflects may have escalated in violence over the years. The jury could have determined that Smith's damaged personality could nevertheless be rehabilitated or that his behavior in response to his childhood was due in part to his youth or the proximity of his home-life experiences to the offense. However, if the jury determined that growing out of his youth would not remove the indelible influence of his

---

**20.** *Id.*

**21.** *See Richard v. State*, 842 S.W.2d 279, 283 (Tex.Crim.App.1992).

childhood and he would therefore present a future and continuing danger to society and yet believed that the explanation for his behavior made the death penalty inappropriate, the jury could not have expressed this view through the special issues. Thus, such evidence could not be given a mitigating effect by the jury's answers to the special issues, and Smith was entitled to an additional instruction providing the jury with a vehicle to give effect to his mitigating evidence.

The jury might have concluded, as the majority suggests, that evidence that Smith's behavior in school was often "exemplary" despite applicant's limitations and difficulties indicated that Smith could learn from his mistakes and evaluate the consequences of his actions. However, the jury may also have concluded that evidence that his often "exemplary" behavior was increasingly interrupted with disruptive and even criminal behavior, indicated that try as he might, Smith was not able, as hopefully people in general are able to do, to control his impulses and surmount and learn from his negative experiences. The jury did not need an expert witness to draw this reasonable conclusion from them.

### *Penry II's* holding—unconstitutional nullification instruction

Unlike the majority, I do not find that the nullification instruction Smith received is significantly distinguishable from the one reviewed by the Supreme Court in *Penry II*. None of the differences between the instructions in *Penry II* and the instant case alter the fundamental aspects of the vehicle that was provided to the jury in an attempt to allow the jury to consider and give effect to the defendants' mitigating evidence. This vehicle, not merely the

description of it, was at the heart of the Supreme Court's reasoning in determining that the instruction in *Penry II* was insufficient. The Supreme Court made this clear by assuming the jury could have understood that the instructions operated in the manner the State argued: by allowing the jury to change to a negative its answer to one of the special issues based on something other than what the question asked.[22] Therefore, providing the same vehicle in more explicit terms does not overcome the defects identified in *Penry II*.

Additionally, the same contradiction between the verdict form and the supplemental instructions exists here as in *Penry II*.[23] The verdict form still contained only the language of the special issues. Even if the nullification instruction clearly trumped the instructions regarding how to answer the special issues, a juror could have reasonably believed that following the instructions would violate the juror's oath to render a true verdict. A juror believing this could have reasonably concluded that there was, therefore, no effective vehicle for expressing the view that Smith did not deserve a death sentence because of his mitigating evidence.

The majority focuses on the use of mandatory language used in Smith's instructions versus the permissive language used in the instructions given to Penry. Although I find mandatory language in Penry's instructions equivalent to that in Smith's, I find no merit in this argument because making it mandatory rather than permissive to return a false answer makes the answer no less false. Such an answer would be given in violation of the juror's oath to render a true verdict, when the

---

**22.** *Penry II,* 532 U.S. at 798–99, 121 S.Ct. 1910.

**23.** *Penry II,* 532 U.S. at 799, 121 S.Ct. 1910.

verdict form contained only the language of the statutory special issues.

Even if Smith's nullification instruction is more similar to the instruction in *Robertson* than to the one in *Penry II*, the Fifth Circuit did not determine that such a nullification instruction would be sufficient where *Penry I* evidence exists.[24] In its *en banc* opinion on rehearing, the Fifth Circuit reasoned that the nullification instruction was redundant in Robertson's case because it determined that the jury could give effect to the mitigating evidence within the scope of the special issues.[25] In the original panel opinion on remand, the Fifth Circuit did not determine whether Robertson was entitled to a *Penry* instruction; it found Robertson's instructions fell prey to the same defects the Supreme Court identified in *Penry II*. The statement in *Robertson*, quoted by the majority, does not support the majority's conclusion that a distinction in the wording of the instruction cured the defects identified in *Penry I*. That quote refers to the Fifth Circuit's reasoning that because the answers to the special issues would be the same regardless of the supplemental instruction where the mitigating evidence could be considered within the scope of the special issues, there would be no potential for contradiction and the jury would not be forced into the position of falsely answering "no" to the supplemental instructions.

It also does not follow that "if Robertson was not entitled to relief under *Penry II*, then applicant is not entitled to relief." *Robertson* was remanded to the Fifth Circuit by the Supreme Court after *Penry II* because *Penry II* is applicable to cases beyond Penry's. The Fifth Circuit had

previously affirmed Robertson's death sentence based on the appropriateness of the nullification instruction. However, after *Penry II*, whether Robertson's nullification instruction was sufficient as to Robertson's evidence was called into question. We stayed Robertson's execution in light of our pending review of *Smith*.

I also note that while the Fifth Circuit said, in its en banc opinion in *Robertson*, that Texas trial courts "could not craft entirely new jury interrogatories, because the precise questions had been written by the state legislature," [26] the same year that we approved of the trial courts' use of nullification instructions in *Fuller*, we also determined it was not error for trial courts to have submitted judicially-crafted jury interrogatories in an effort to comply with *Penry I's* mandate.[27] There existed a reasonable likelihood that the jury, under oath to return a true verdict, applied the nullification instruction in a way that precluded them from giving effect to Smith's mitigating evidence.

Based on the Supreme Court's reasoning in *Penry II*, I would conclude that the nullification instruction Smith received would not be a sufficient vehicle, under *Penry I*, to allow the jury to give effect to the defendant's mitigating evidence relevant beyond the scope of the special issues.

Because the mitigating value of Smith's evidence could not be considered and given effect within the special issues and the jury was not provided with a sufficient vehicle for expressing its reasoned moral response to his evidence, the Texas capital punishment statute operated in an unconstitutional manner as applied to Smith.

24. *Robertson v. Cockrell*, 325 F.3d 243, 258 (5th Cir.2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003).

25. *Robertson*, 325 F.3d at 257.

26. *Robertson*, 325 F.3d at 248–49.

27. *State v. McPherson*, 851 S.W.2d 846, 850 (Tex.Crim.App.1992).

But for his failure to object to the nullification instructions at trial, Smith would be entitled to a new punishment hearing.